No. 10,913.

NICHOLAS O'CONNOR vs. ILLINOIS CENTRAL RAILROAD COMPANY.

1. The possessor of lands or tenements is not at liberty to plant in them dangerous instruments which may seriously injure trespassers; but he is under no duty to keep his premises in a safe condition for others than those whom he *invites;* and, therefore, he is not liable to trespassers for injuries they may receive from defects, not amounting to traps, in such premises.

2. If a person allows dangerous implements to be exposed on a premises occupied by him, he will be responsible for injury caused thereby to any person entering the premises by his invitation or procurement, express or implied, who is not notified thereof, if he be in the use of due care.

3. The owner of land or other property may *properly enclose* dangerous machinery upon his own premises, such machinery being an essential industrial factor; and a trespasser who meddles with such machinery can not recover damages for the injuries his meddlesomeness has brought upon himself.

4. Railroad companies are not placed under the same degree of obligation as to care and diligence to guard against injuries to strangers as they are to those with whom they have contract relations. To the former their obligation is, upon considerations of humanity and justice, to conform their conduct as to the rights of others, and, in the prosecution of their lawful business, *to use every reasonable care and precaution to avoid their injury.*

5. In so far as children "of tender years" are concerned, no fault or blame can attach to them for entering upon the premises of another uninvited, for in all cases they may be assumed to have exercised due care; and if, upon so entering, they be injured by dangerous implements of the occupant, the question determinative of the latter's negligence is, whether they had an invitation either express or implied, to enter.

A PPEAL from the Civil District Court for the Parish of Orleans.
    *Ellis, J.*

T. J. *Gilloly* and *Branch K. Miller* for Plaintiff and Appellee:

Where a defendant negligently exposes, on his private property, to which he has allowed for years free access by children to play with a dangerous machine unguarded and unsecured, likely to attract children, excite their curiosity, and lead to their injury, while they are pursuing their childish instincts, he is liable to a child of tender years injured while playing with it. 43 An. 64; Beach on Cont. Neg. 69, 70; 17 Wall. 157; 21 Minn. 209.

*Girault Farrar* for Defendant and Appellant:

1. The "turntable" cases have no application here, where the *locus in quo* was defendant's private premises, enclosed with a high board fence, and where defendant took all reasonable precautions to keep children out. Hargreaves vs. Deacon, 25 Mich. 1; Stout vs. Railway Co., 17 Wall.; Keefe vs. Railway Co., 21 Minn.; Westerfield vs. Levis, 43 An.

2. The proximate cause of the child's injury was the father's negligence, which he has not attempted to deny by competent evidence. Montfort vs. Schmidt, 36 An.; Mullins vs. Blaise, 37 An.

3. The wife's testimony in a case where the husband is plaintiff, having an identity of interest with him, is inadmissible upon grounds of public policy. C. C., Art. 2281; C. P., Art. 482; Tulley vs. Alexander, Administratrix, 11 An. 628; Cooley vs. Cooley, 38 An. 197; Dillon vs. Dillon, 32 An. 643.

4. Defendant was not guilty of negligence at all under the facts. The accident was unavoidable by any reasonable precaution on defendant's part. Hearne vs. R. R , 34 An. 160; Montfort vs. Schmidt, 36 An.

5. The judgment of the lower court awarded interest on unliquidated damages Holzhab vs. R. R. Co., 38 An. 185.

The opinion of the court was delivered by

WATKINS, J.   The father institutes this action for the recovery of $25,000 damages, as compensation for injuries inflicted upon his minor child, which resulted in the amputation of his left leg, causing great pain and suffering.

The case was tried by the judge, who found $7500 for the plaintiff, and defendant has appealed.

Plaintiff's counsel claims that the case made out by the evidence is that the accident happened on a square of ground belonging to the defendant, bounded by Magnolia, Clio, Locust and Calliope streets, in the city of New Orleans, and which the company used for the storage of old freight cars of sundry kinds, trucks and wheels not in service.

O'Connor vs. Railroad Co.

That amongst other things usually stored in this yard were what are called coal-dumps or cars of a peculiar construction, being composed of only two wheels attached together by an axle, and on which is placed a wooden frame-work which extends fore and aft, and may be seesawed on either side of the axle. That this square is surrounded by a plank or board fence, "which, for years, has, at all times, been *full of holes*, caused by missing planks," through which the children of the neighborhood would pass in and out in going to and returning from play, and where they frequently resorted, being attracted there by the coal-dumps, on which they would amuse themselves; some riding, while others pushed them along the rails. That, in accordance with the established usage of the neighborhood, plaintiff's child went into the yard, in company with a party of children to play, and, while riding on one of these coal-dumps, which was pushed along the track by others, he fell off and was run over by the car, receiving injuries necessitating the amputation of his leg.

It will be observed from the foregoing that plaintiff's reliance is, solely and exclusively, for proof of defendant's negligence, upon the customary and long protracted bad condition of its fence, enclosing the premises above described, which operated an invitation and inducement to children of the neighborhood to resort to the dangerous proximity of these coal dumps, to play.

This theory is combatted by defendant's counsel on the ground that the evidence shows that the employés and agents of the defendant used *every reasonable precaution* to keep children out of its yards; and that the *proximate* cause of the accident was the act of the *child's companions and older boys*, who accompanied him into the yard—one of whom was an elder brother.

That the whole front of the company's yard, fronting on Locust and Clio streets, *is* protected by a high, close board fence about seven (7) feet in height, except where it is intersected with public streets, through which there are openings, so as to allow cars to be switched across said streets into other and adjoining squares belonging to the company.

That on the evening of the 23d of July, 1890, the plaintiff's minor child went into the yard, with a party of little comrades, and commenced playing with the wheels on the defendant's tracks, when the accident happened, and injury resulted as stated above.

Taking the statements together, the solitary question of fact

mooted, seems to be whether the customary bad condition of the
defendant's fence was such as to offer inducement to children of the
neighborhood to enter their yard for purposes of amusement and
play; and this being determined favorably to plaintiff, the question
of law thereon raised is the negligence *vel non* of defendant under
the circumstances related.

In this, as in kindred cases, there are, apparently, many incompat-
ible statements of fact, which we shall not attempt to traverse in
detail and reconcile, but rest contented with the announcement of
our conclusions on this particular question, after recapitulating the
evidence.

The plaintiff introduced several witnesses residing in the immediate
vicinity of the place where the accident happened, and who were
supposedly familiar with the defendant's premises, from frequent
and personal observation; and from their testimony we extract the
following synopsis, viz.:

One of them testifies that near the corner of Locust and Clio
streets there were *two or three* of the planks broken off of the com-
pany's fence at one place through which he saw persons frequently
passing.    That it was afterward repaired by the company's em-
ployés, and then broken again.    That that was the only opening he
saw at that time—there being no openings in the fence on the Clio
or the Calliope street side.

. This witness was the gentleman who heard the child's cry of alarm,
and ran to his relief, and removed the truck-wheel from his broken
limb.

Another one—a little fellow of thirteen years of age, who was one
of the companions of the injured boy—confirms the statement of the
witness just referred to, and says that it was *through this opening* they
entered the defendant's yard on the evening of the accident.

Another speaks of two or three openings in this fence, several
months previous to the occurrence—two or three big openings, and
about four little ones; the larger ones being about two (2) feet wide.
But there was an opening on the Magnolia street side to allow cars
to be switched across the street into the adjoining yards.

Another testifies, in a general way, that the fence was " always
(at) one time or another broke;" that he frequently " passed through
the yard for a short cut;" that he passed through the hole in the
fence at the corner of Clio and Locust streets.    He only refers to
one other hole.

Another describes the same two holes.

Another, one place only, where there was a single plank off. Another speaks of two places; and another of "three or four places where there were planks knocked off."

This is a fair summary of plaintiff's testimony on the subject.

With regard to the length of time these holes remained continuously open, the witnesses differ widely—some stating for a few weeks, and others for one or two years.

But, on the contrary, defendant's witnesses, while admitting the existence of holes in the fence, deny that same existed for *any considerable* length of time, and affirm that the fence was frequently repaired, and as frequently broken down again; and, while admitting that children and boys often congregated in defendant's yard—climbing over the fence, or passing through the holes—they were just as repeatedly driven out, and warned against trespassing again.

One of the company's employés, a car inspector, states that he has seen boys knock the fence down. He has seen them climb over the fence many a time; and that to keep them out has been a matter of great trouble to him. Has frequently seen the switchman and others drive them out of the yard. He says that he could see no possible way of keeping them out, except by the company detailing a man for that special purpose.

Another, the yard foreman, states that he has frequently driven the children out of the yard, and just as soon as he was out of sight they would come in again. He says it would "require an army of policemen steadily (employed) to keep them out." He states further "that when the fence was fixed, they would get in by way of Magnolia street, where there is a gate, through which the cars pass to and fro, and in and out of the yard. We had locks, and every time they were fixed on the gates, they would break them."

Another, the night watchman, states that he has frequently driven children out of the yard, and has himself nailed up the hole in the fence at the corner of Clio and Locust streets. "They kept me busy getting nails all the time, to keep the planks up. Whenever I saw one down I nailed it up again." Has often seen boys climb that fence, and has thrown them off of it.

Another witness, who lives opposite the corner of Clio and Locust streets, states that he has seen the hole in the fence at that place repaired frequently. Saw it open and then closed; and then saw the boys knock it down again.

Another witness fully corroborates his statement.

The section foreman, whose duty it is to keep the fence in repair, states that he has been engaged in that capacity for twenty (20) years, and during that period of time has resided within a block of defendant's yard, and that he has repeatedly closed the hole in the company's fence at the corner or Clio and Locusts streets; and that he closed it once in May, and again in June, prior to the happening of the accident, on the 23d of July, 1890. That he had occasion to mend it ten (10) or fifteen (15) times a year, on account of boys knocking it down. Says he would repair it on one day and go back on the following day and find it down again.

Another witness, a master mechanic, says that on the *identical evening* on which the accident occurred, he chased a party of children out of this yard.

On this state of facts was the defendant guilty of negligence, or did the company's agents and employés exercise due care and caution ?

It must be borne in mind that the plaintiff is an *utter stranger* to the railroad company, claiming damages *ex delicto*, with whom neither the child or its parent had any contractual, or even *quasi* contractual relations at time of the accident.

And just here we may, with propriety, advert to the views entertained by the judge *a quo* in respect to the testimony, and which grounded his judgment in plaintiff's favor.

In recapitulating the evidence he says, amongst other things:

"The grounds are enclosed by board fences, but in those fences are openings caused by planks being removed, which made entrance into the grounds from the public streets a matter of no difficulty. These openings at different places remained *unclosed for months preceding* the injuries of plaintiff's child."

It is proper, just here, to observe that, on this question, there is a *diversity of opinion* among witnesses, but the whole of it has given us an impression just opposite that which our learned brother of the lower court has received.

It is true that one of plaintiff's witnesses said in a general way that the fence was "always, [at] one time or another, broke," and that he frequently and customarily "passed through the yard for a short cut;" yet he accompanies this statement with the admission that he passed through the hole at the corner of Locust and Clio streets, and

refers to but one other hole in the fence around *this particular* yard. The proof affirmatively shows that plaintiff's child passed through *this hole*, on the afternoon of the accident. No witness testifies that any child, or adult, or animal, passed through *any other hole*, into the defendant's yard.

Defendant's night watchman testifies that he nailed *this hole* up frequently.

A gentleman who lives opposite that corner, as a witness, states that he has frequently seen this particular hole repaired; saw it open, and then saw it closed again. Saw the boys knock it down. This witness is substantially corroborated by two other witnesses who are strangers to the company.

In addition, the section foreman, who resides a block and a half away, and whose special duty it is to keep this fence in repair, amongst other things, as a witness, states that *he has repeatedly closed this hole*. That he closed it once in May and again in June of 1890, just prior to the accident on the 23d of July. That he has had occasion to mend it ten or fifteen times a year, on account of the boys knocking it down. That he would repair it on one day, and go back on the following day and find it down again.

The judge further observes "that whilst the company knew all these facts [and] took measures at times to mend the broken places, and to drive children from the enclosure, is [a fact] well established, [yet] it did not take the *proper measures*, nor make the needed repairs"—as it did subsequently.

But in this regard we are of opinion that it is matter of importance to be considered that two or three witnesses testified that they saw children climb over the fence to get into the yard. One witness states that he pushed little boys off the fence. One of plaintiff's witnesses states that there was an opening on the Magnolia street side of the square to allow the cars to be switched through on the company's track; and one of the defendant's witnesses states that "when the fence was fixed they [the boys] would get in by way of Magnolia street, where there is a gate through which the cars pass, etc. * * * We had locks, and every time they were fixed on the gates they would break them."

It seems to us that it would be rather a difficult question to determine what, under such circumstances, would be the "proper measures" for the railroad company to take; but what is of greater

importance for us to determine is, whether the means resorted to were sufficient to relieve the company from imputation of negligence.

The lower judge evidently did not think the proof of defendant's negligence, in reference to the openings in the fence, sufficient, because he adds another reason altogether for his conclusions, thus:

" It was negligence to leave the trucks and dumpers and connected wheels on the tracks, for they were not only exceedingly dangerous, but of a nature to tempt the curiosity and invite the playfulness of children.  *  *  *  *  The defendant's negligence left the dangerous dumpers, wheels and trucks in close proximity to the streets, in a thickly populated neighborhood, where they could be seen by passers by, and where they could be easily approached by children.   They were not securely enclosed, nor locked, but were left exposed where they could be set in motion by a child."

The judge evidently had in mind the case of Westerfield vs. Levis Bros., 43 An. 64, and Railroad Co. vs. Stout, 17 Wall. 657, to which he makes reference.   But the facts of this case—so far as we have proceeded with the discussion—render them impertinent to the question of the defendant's negligence; and so also is the averment of fact, that it was negligence of defendant to leave the coal dumps, etc., on its tracks, or in close proximity to the streets; or that they were left exposed and unlocked—if the tracks were inside of an inclosure of sufficient height and strength to keep innocent and unsuspecting children out of their reach.   And we think the proof abundantly shows that defendant's fence was adequate for that purpose, so long as it remained unbroken by mischievous persons; and we also think it fully established that the company exercised at least ordinary care to keep it in a safe condition, by making necessary repairs.

In so far as the alleged negligence of the defendant, in reference to the exposure of the trucks, dumps and wheels are concerned, we do not understand that plaintiff's petition or briefs rest on such an hypothesis as that, nor could they do so.

The law of this case, as developed by the facts recited, may be briefly stated:

It is founded on the law of damages ex delicto, as announced in the code, which declares that " every act whatever of man that causes damages to another obliges him, by whose fault it happened, to repair it."   R. C. C. 2315.

" Every person is responsible for the damage he occasions, not

merely by his act, but by his *negligence* * * or his want of skill."
R. C. C. 2316.

It is founded on *fault* or *neglect.*

A distinguished author, in a treatise on negligence, says: "It is enough to say now that a possessor of lands or tenements is not at liberty * * * to plant in them dangerous instruments which may seriously injure trespassers, but he is under no duty to keep his premises in a safe condition for others than those whom he *invites,* and therefore he is not liable to *trespassers* for injuries they may receive from defects, not amounting to traps, in such premises." Wharton on Negligence, Secs. 344, 821.

Again he says:

"If a person allows a dangerous place to exist in premises occupied by him, he will be responsible for injury caused thereby to any other person entering upon the premises by *his invitation or procurement, express or implied,* and not notified of the danger, if the person injured *is in the use of due care.*" [Our Italics.] Id., Sec. 826, citing Coombs vs. New Bedford Co., 102 Mass. 572; Id., Sec. 350.

To such a case, the rule *sic utere tuo,* etc., applies. With reference to children of tender years, it may be conceded that they *proceeded with due care,* but can it be said that the condition of defendant's fence operated as an "invitation or procurement, express or implied?"

Upon this precept another important rule has been formulated by that author, viz.:

"The owner of land or other property may properly enclose dangerous machinery o i [his] own premises, such machinery being an essential industrial factor. * * * Hence comes the well established rule that *a trespasser who meddles with an instrument in itself dangerous can not recover damages for the injuries his meddlesomeness has brought on himself.*" Id., Sec. 347.

But the author says further:

"So with regard to leaving a dangerous implement on a thoroughfare. It is *negligence to leave such an instrument on a place of public access, where persons are expected to be constantly passing and repassing,* and where persons are not required to be on their guard, or *where children are accustomed to play;* but *it is not negligence to leave such an instrument in a private inclosure which, from its very privacy,*

*excludes the public and puts on their guard all who enter.*" [Our Italics.] Id., Sec. 112, citing Railroad Co. vs. Stout, 17 Wall. 657.

And in referring to that case the author speaks of the principle therein announced thus: " It was held that the company was liable for damages sustained by a boy when playing with a turn-table *left by the company unguarded and unlocked on its own grounds*, it being shown that the boys of the neighborhood were in the habit of resorting to the place for play, and that this was known to the company." Id., Sec. 860.

A parallel case is cited from Lane vs. Atlantic Works, 111 Mass. 136.

These various citations from this justly celebrated author, which are predicated on the established jurisprudence of the country, are quite sufficient to show that the instant case does not disclose the defendant's negligence as matter of law. For, if little boys did resort to the defendant's premises for purposes of amusement and play, habitually, it was certainly against the defendant's wishes and over its agents' and employés' protests, made repeatedly, although ineffectually.

Notwithstanding the fence of the company, enclosing the dangerous coal-dumps and wheels, was frequently open, in places—possibly for a greater lengh of time than it should have been allowed to remain open—yet these openings were not occasioned by the company's employés or persons holding even *quasi* contractual relations with it; but they were occasioned by acts of trespassers upon their private grounds.

And the proof is clear that the agents and employés exercised ordinary care in its safe-keeping. They used timely and repeated efforts to keep the apertures closed. The children were repeatedly warned against the danger and driven away. And on more than one occasion they were pulled off of the fence.

Mr. Hutchinson announces the general rule to be that railroad companies are not placed under the " same degree of obligation as to care and diligence, to guard against injuries to *strangers*," as they are to those with whom they have contractual relations. For, with regard to the former, their " duty is governed by the general principle of law, that every one is obliged, upon consideration of humanity and justice, to conform his conduct to the rights of others, and, in the prosecution of his lawful business, to use every *reasonable precaution to avoid their* injury." Hutchinson on Carriers, p. 447.

And this rule has been sanctioned in many cases. Snyder vs. Railroad Co., 42 An. 302; Lott vs. Railroad Co., 37 An. 337; Hogg vs. Railroad Co., 85 Penn. St. 293; Cawley vs. Railroad Co., 98 Penn. St. 500; Wharton on Negligence, Secs. 300, 301; Thompson on Carriers pp. 344, 345; Hearn vs. Railroad Co., 34 An. 160; Montfort vs. Schmidt, 36 An. 750; Reary vs. Railroad Co., 40 An. 32. To this rule the case of Westerfield vs. Levis Bros. 43 An. 67, does not apply; for in that case the negligence of the *defendants* was fully established by their having left a heavy iron roller, with two mules attached thereto, unattended by a driver, *on an open public street*—the mules not fastened, and the wheels of the roller unlocked. The aggravated question in that case was, whether the child, who was mortally injured, was of sufficient age and discretion to have been guilty of contributory fault.

The general rule as announced by Mr. Wharton, that *"there is no duty imposed upon the owner or occupant* of premises to keep them in a suitable condition for those who come there for *their own convenience*, merely, *without any invitation*, either express or which may fairly be implied" from the surrounding circumstances, has been sanctioned in many cases. Sterry vs. Nickerson, 120 Mass. 306; Pierce vs. Whitcomb, 48 Vt. 127; McAlpin vs. Powell, 70 N. Y. 126; Gramlick vs. Wurst, 86 Penn. St. 74; Railroad Co. vs. Hernch, 23 Kan. 347; Morgan vs. City of Halowell, 57 Me. 375; Railroad Co. vs. Carreher, 47 Ill. 333; Murray vs. McLean, 57 Ill. 378.

In conclusion we can not do better than quote an illustration of the rule stated, from the case of Hargreaves vs. Deacon, 25 Michigan, 1, in which the plaintiff sued as administrator of his minor child of tender years, who was killed by falling into a cistern of the defendant, which had been left uncovered; and in stating the duty of protection and care on the part of the proprietor the court say: "If on private property, not open of right to the public, it applies less generally, *and only* to those who have a legal right to be there, and to claim the care of the occupant for their security, while on the premises, against negligence, or to those who are directly injured by some positive act involving more than passing negligence.

" Cases are quite numerous in which the same questions have arisen which arise in this case, and we have found none which hold that an *accident from negligence on private premises* can be made the ground of damages, unless the party injured has been *induced to*

come by *personal invitation*, or by employment which brings him there, or by resorting there *as* to a place of business, or of *general resort held out as open to customers or others whose lawful occasions may lead them there.*

" We have found no support for any rule which would protect those who go when they are not invited, but merely with express or tacit permission, from curiosity or motives of private convenience in no way connected with business or other personal relations with the occupant."

On a full and exhaustive examination of the facts furnished in the record, and all the authorities appertaining thereto, we are fully convinced that the negligence of the defendant is not made out, and the plaintiff's case must fail, and the judgment be reversed.

It is therefore ordered and decreed that the judgment appealed from be reversed; and it is now ordered that the demands of the plaintiff be rejected at his cost in both courts.

Rehearing refused.