## BUILLIARD v. N. O. TERMINAL CO.
### No. 16128.

Court of Appeal of Louisiana. Orleans.
March 23, 1936.

On Application for Rehearing.
April 20, 1936.

Monroe & Lemann and Walter J. Suthon, Jr., both of New Orleans, for appellant.

Edward M. Heath, of New Orleans, for appellee.

McCALEB, Judge.

Plaintiff, a negro carpenter 54 years of age, files this suit for damages resulting from injuries received by him in jumping off a railroad bridge, owned and operated by the defendant, over Bayou St. John in the city of New Orleans.

The main defenses to the suit are: (1) That the plaintiff was a trespasser or a mere licensee upon the private property of the defendant, and that, under the law, defendant owed him no duty of care other than to not wantonly or willfully injure him; and (2) In the alternative, should the court find that the plaintiff was an invitee upon defendant's property and that there was a lack of care on the part of the defendant, then, in that event, plaintiff was guilty of contributory negligence in certain particulars properly pleaded and enumerated in the answer.

The case was tried below before a jury, resulting in a verdict in plaintiff's favor for the sum of $1,750. On motion for new trial, the plaintiff entered a remittur, under order of the lower court, accepting a reduction in the verdict of the jury of $500, and judgment was finally decreed in his favor for the sum of $1,250. From this judgment defendant has appealed.

The record is voluminous, and involves both questions of law and fact.

In addition to the problem of liability of the defendant here presented, there is also a proposition of law referring to alleged prejudicial error by the trial court in rejecting certain evidence offered by the defendant.

The facts of the case may be stated as follows:

The accident occurred on the afternoon of September 19, 1933, in the city of New Orleans, at a bridge known as the "Black bridge," where the railroad tracks of the defendant cross Bayou St. John in the vicinity of City Park. This bridge carries two railroad tracks, and is used exclusively by the defendant for railroad purposes; there being neither a walkway situated thereon for pedestrians nor a roadway for vehicles. There is considerable testimony in the record, however, that, as a matter of fact, pedestrians use this bridge and that the employees of the defendant in charge of the bridge have actual knowledge of such use.

This bridge is approximately 60 feet long and is a drawbridge of the cantilever type, extending across Bayou St. John from the Mississippi river side to the City Park side thereof. In opening the draw, the end of the bridge on the Mississippi river side of Bayou St. John rises, but the end of the bridge on the City Park side does not rise. The bridge is operated by employees of the defendant known as "bridge tenders" from a tower on the City Park side of the bridge.

The tower is supported by two steel posts on the City Park side of Bayou St. John, and is situated approximately 35 feet above the level of the bridge.

The plaintiff, on September 19, 1933, was one of a great number of ERA workers engaged in an extension project of City Park in the direction of Lake Pontchartrain. It is undisputed that during the greater portion of plaintiff's employment by the ERA, or for a period of several months, plaintiff, together with other negro laborers, were driven in trucks from their homes, in the city of New Orleans, to a point adjacent to the Mississippi river side of the bridge each morning at approximately 7 a. m.

The testimony reveals that several hundred of these employees of the ERA, including the plaintiff, would customarily cross over the Black bridge in order to get to work from the point on the river side of the bridge where they depart from their trucks. The evidence further shows that, up to a month before the accident occurred, some of the trucks would cross Bayou St. John over the Esplanade avenue public bridge which is approximately three quarters of a mile nearer the city of New Orleans on Bayou St. John than the Black bridge, and that these trucks would follow a road on the City Park side of Bayou St. John to a point at or near the Black bridge. This procedure had been discontinued for a month before the accident, because the road on the City Park side of Bayou St. John from the Esplanade avenue bridge to the Black bridge was impassable, and the

only vehicular road open to use after that period by the ERA workers was the road extending on the Mississippi river side of Bayou St. John from the Esplanade avenue bridge to the Black bridge.

The testimony also reveals that these ERA workers were relieved of their duties at approximately 2 p. m. each afternoon, and that it was their custom to recross the Black bridge, from the City Park side to the Mississippi river side thereof, in order to board the trucks which were waiting to haul them home at or near the Mississippi river side of the Black bridge.

On the date of the accident, after completing the work of the day and shortly past 2 p. m., plaintiff, together with some other workmen, walked through City Park to the Black bridge and then started to traverse this bridge from the City Park side to the Mississippi river side thereof for the purpose of boarding these trucks in order to ride to their respective homes.

Plaintiff claims that while he and several other men were on the bridge it started to rise. All of these men ran to the rising end of the bridge and jumped off to the bank. Plaintiff was the last man to make this jump, and as a result thereof sustained a broken leg.

The plaintiff testifies that the bridge started to rise without any warning as he and his fellow workmen were walking across it. He is corroborated in his statements, for the most part, by four other colored men, all of whom were his fellow workers, except one Wilbert Drummond, who was the driver of the truck which was to take plaintiff to his home. These witnesses all testify that quite a number of workmen (between 10 and 20) were on the bridge at the time it started to rise, and that all these men jumped off the bridge; that plaintiff was the last man of his party to jump off, and that he was further from the rising end of the bridge than any of the other men. These witnesses also testify that the bridge had risen from 8 to 10 feet from the ground on the Mississippi river side when plaintiff jumped off. None of these witnesses are able to say how fast the bridge was rising, but taking their testimony as a whole, it is safe to conclude that their opinion is that the bridge starts to rise slowly and that the speed is increased as it goes up.

It will be observed that the only real purpose in raising the bridge is to allow boats or vessels navigating in Bayou St. John to pass under it. Plaintiff and his witnesses all claim that they did not hear a boat whistle, signal, or other noise of any sort before the bridge started to rise, and that they saw no boat pass under the bridge after it was raised on this occasion. In fact, plaintiff and all of his witnesses testify positively that, although they had been working in that vicinity for some months, and had crossed the bridge twice a day during that period, they neither saw the bridge rise for boats to pass thereunder, nor did they hear boats signaling the bridge for the purpose of having it raised. One of the witnesses, however, did say that he saw the bridge rise on one occasion when he was going to get water away from his work.

After the accident the plaintiff had to be assisted from the point from where he fell, as a result of his jump from the bridge, to the truck on which he rode home, on account of the injury which he sustained in making this jump. Plaintiff's evidence fails to disclose that he, or his fellow workmen, notified the employees of the defendant at the time of the accident, of the occurrence of the accident.

It is conceded by the defendant that there are no signs on or near the Black bridge warning pedestrians to keep off of the same, and the bridge tenders, who testified for defendant, admit that they knew that hundreds of these ERA workers and, on some occasions, other persons used this bridge as a roadway, and that they did not report its use to their superior officers.

Defendant's witnesses contend that they were continually yelling at these negro workmen to keep off the bridge, but there is no evidence to show that any warning was ever given to the plaintiff not to use the bridge.

Defendant's testimony consists of the evidence of its superintendent, one Chambers, who testified that the ERA had never requested the defendant's permission for the use of this bridge as a footbridge by these workmen, and that defendant received no compensation whatsoever for the use of this railroad bridge by these pedestrians. This witness also testified to the dimensions of the bridge, how the bridge was operated, but he was not present on the day of the accident.

Two other witnesses produced by the defendant were bridge tenders. One of these men, one Joubert, testifies that on the date of the accident he was on duty as bridge

tender from 7 a. m. to 3 p. m., and that another bridge tender was present at 2:45 p. m., but did not go on duty till 3 p. m. This witness says that he knows nothing of the accident and resulting injuries to the plaintiff. To the same effect is the testimony of the other bridge tender, one Calongne.

These bridge tenders both assert that the defendant required them to keep a record, in a book, showing the time of each raising and lowering of the bridge, and the name and the number of the boats going under the bridge on each raising. The bridge was never raised other than for the purpose of allowing boats to pass through, except when the bridge was being painted. These bridge tenders further aver that they are stationed in a tower which is situated about 35 feet from the ground. From this tower they can see objects from all directions except that their vision is obscured from persons who may be situated directly under the tower. They describe the procedure in raising the draw as follows:

Upon a signal given by boats within the vicinity of the bridge desirous of passing thereunder, the bridge tender is compelled to throw ten levers, situated in the bridge tower, which levers signal on-coming trains that the bridge is about to be raised. These levers are attached to iron pipes running to the ground and extend on to the semaphores situated some 500 to 1,000 yards distant. After the levers have been thrown the bridge tender goes to the window and warns any person within the vicinity of the bridge that the draw is about to be raised. He then proceeds to raise the bridge, which is done by first placing the control in first speed and then shifting into second. While there are five speeds which may be used in raising the draw, under instructions from the company, the bridge tender only uses first and second speed. The time elapsing in raising the draw 10 feet, in first speed, is 40 seconds. In raising the bridge 10 feet by using both first and second speed a period of between 10 and 20 seconds of time is required.

Both of these bridge tenders emphatically deny any knowledge of the accident, and show, by reference to the record book which they used in refreshing their memory, that on the date in qestion the bridge was raised at 2 p. m. for the passage of a boat and lowered at 2:05 p. m. The bridge was also raised at 2:43 p. m. and lowered at 2:49 p. m. for the passage of two boats.

These were the only occasions on which the bridge was raised or lowered between 2 and 3 p. m. on the date of the accident.

There are no signal bells or other devices for warning the public that the bridge is about to be raised.

In connection with the testimony of the bridge tenders, defendant attempted to offer in evidence the record book kept by the bridge tenders, which exhibits the number of times per day the bridge is raised or lowered and the name of the boats passing thereunder. The purpose for placing this book in evidence was in contradiction of the testimony of plaintiff and his witnesses that, during the period of time that they were using the bridge, they had never seen it raised or lowered, and for the further purpose of showing that boats habitually passed under the bridge. The district judge refused to admit this record in evidence.

The first question of law for determination, under the facts as above set forth, is with respect to the status of the plaintiff in this case. Defendant contends that plaintiff was a trespasser on its property, and that, even though we do not consider him to be a trespasser, he was no more than a mere licensee. In either event, defendant avers the rule with reference to the duty of care imposed upon it not to injure him is the same; that is, the obligation of a person in possession of property to trespassers or licensees is that the defendant must not use his property in such a manner so as to willfully or intentionally injure them.

On the other hand, plaintiff contends that he occupied the status of an invitee upon the premises of the defendant, and that defendant owed him the duty of ordinary care under article 2315 of the Civil Code. Alternatively, plaintiff asserts that even though he is found to be a licensee upon the premises of the defendant, that defendant's servants were guilty of such gross misconduct and negligence which amounts to willful and intentional injury.

Hence, at the outset we must first decide whether the plaintiff was a trespasser or an invitee or a licensee upon the property of the defendant.

From the evidence presented we are convinced that the plaintiff was not a trespasser. The defendant knew that he and other workers traversed this bridge daily. This procedure had been going on for several months and hundreds of men went over

the bridge. No active steps were taken by the defendant to keep the ERA workers off its property. Protection against the unwarranted use of the bridge might have been easily accomplished by protesting to the ERA or by the posting of signs upon the bridge. One may not stand idly by and see another use his property as the highway day after day and later claim that such person is a trespasser. To hold otherwise would be to convert a silent acquiescence into an active protest. It is a frail answer for the defendant to aver that a person employing its property would disdain signs or other notices posted thereon, for resolute objection by the defendant to the use of its property should and would be properly considered by the courts in determining the status of the parties.

In holding that the plaintiff was not a trespasser we next consider whether he was an invitee. While defendant did allow, by sufference, the ERA workers to use the bridge, there was no material advantage to it in so doing. In Vargas v. Blue Seal Bottling Works, Ltd., 12 La.App. 652, 126 So. 707, we said: "In order to create the status of an invitee, there must be to some extent a mutuality of interest."

Certainly there was no mutuality of interest between the plaintiff and defendant in the instant case. As a consequence, plaintiff may not be classified as an invitee on defendant's property.

It accordingly follows that plaintiff, being neither trespasser nor invitee, his status was that of a licensee.

■ Defendant claims that, if the plaintiff was a licensee, it owed him no duty of care other than to refrain from willfully or wantonly injuring him. Cases are cited supporting this contention, and much reliance is placed upon our opinion in Vargas v. Blue Seal Bottling Works, Limited, supra.

In the Vargas Case, the plaintiff was given permission by the defendant's president to watch the operation of defendant's machinery located at its factory. While viewing such procedure, a bottle free from patent defects exploded, and, as a result, the plaintiff was injured. We held that plaintiff was neither trespasser nor invitee, but a licensee. We further held that a licensee takes the premises as he finds them, and that the only duty imposed upon the owner was to desist from wantonly or purposely injuring him. But the facts of that case

are vastly different from those of the case at bar. In the Vargas Case, the general duty of the owner of property to a licensee is stated. There was no obvious reason, because of the facts of that case, to discuss a recognized rule which applies to all persons who allow or license others to use their premises.

In 20 A.L.R. 202, it is stated: "The general rule is that where an owner or occupant of premises, with knowledge, and for a long period of time, permits the public to use the premises without objection, for the purpose of traveling across the same on a well established and safe path or highway, he cannot, without giving notice, render the premises unsafe to the injury of those who have used such highway, and have no notice of the changed condition, without being responsible for the resulting injury"—citing Phipps v. Oregon R. & Nav. Co. (C.C.) 161 F. 376; Nashville, C. & St. L. Ry. v. Blackwell, 201 Ala. 657, 79 So. 129; Cahill v. E. B. & A. L. Stone & Co., 153 Cal. 571, 96 P. 84, 19 L.R.A.(N.S.) 1094; Rooney v. Woolworth, 78 Conn. 167, 61 A. 366; De Tarr v. Ferd. Heim Brewing Co., 62 Kan. 188, 61 P. 689; Morrison v. Carpenter, 179 Mich. 207, 146 N.W. 106, Ann.Cas.1915D, 319; Lepnick v. Gaddis, 72 Miss. 200, 16 So. 213, 26 L.R.A. 686, 48 Am.St.Rep. 547; Buchtel College v. Martin, 25 Ohio Cir.Ct.R. 494; Bush v. Johnston, 23 Pa. 209; Allison v. Haney (Tex.Civ.App.) 62 S.W. 933; Nesbit v. Webb, 115 Va. 362, 79 S.E. 330; Brinilson v. Chicago & N. W. R. Co., 144 Wis. 614, 129 N.W. 664, 32 L.R.A.(N.S.) 359; Clark v. Chambers, L.R. 3 Q.B.Div. 327.

See, also, Ruling Case Law, vol. 20, page 65.

Application of this doctrine to the facts of the case at bar demonstrates that defendant had, through its employees, actual knowledge that the ERA workers were using its bridge. By its silence it must be considered to have acquiesced in such use and to have granted a license to the plaintiff and others to employ the bridge as a pedestrian way. Under this license the plaintiff took the bridge as he found it, and the defendant did not warrant that it was free from vices, defects, or hazards. See the Vargas Case, supra.

However, there was an additional duty of care which, by fair and just reasoning, was vouchsafed by the defendant to the plaintiff; that is, the defendant could not alter the condition of the premises which

were being used by the plaintiff so as to create a greater hazard, without first giving to the plaintiff notice of such alteration or change. Hence, if plaintiff was crossing over the bridge, defendant had no right to raise it without warning.

Being of the opinion that plaintiff had acquired a license to use the bridge by virtue of an implied permission granted to him by the defendant and that the defendant thereby owed to the plaintiff the obligation of not rendering the bridge unsafe for travel without previous notice, we now consider the facts of the case in determining the question of defendant's fault.

We have already observed that, if the plaintiff was on the bridge and the defendant raised it without warning him, liability would ensue, provided that the plaintiff was not contributorily negligent. But the evidence presented on this point by the plaintiff is in direct conflict with the evidence of the defendant.

■ Plaintiff and his witnesses claim that he was upon the bridge when it started to rise without warning. Defendant's witnesses assert that they never saw the plaintiff and were without notice of the accident. They also positively state that because of knowledge previously acquired that ERA workmen were using the bridge it was an unvaried practice for them to see that no one was upon the bridge before opening it. If these statements are true, the defendant has discharged its duty to the plaintiff. With the testimony in such state of contrast, the jury, by a vote of 9 to 3, chose to believe plaintiff and his witnesses. But it should be remembered that plaintiff and his witnesses testified that, although they had crossed the bridge at least twice each day over a period of many months, they had no time heard the sound of signals emanating from boats desirous of having the bridge raised for the purpose of passing thereunder, and they had never seen the bridge raised or lowered upon any occasion during this period.

In an attempt to controvert these statements, counsel for defendant properly offered in evidence a record book kept by the bridge tenders showing the number of times the bridge was opened and closed each day, and the names, or other insignia, of the boats passing thereunder. Upon objection the district judge refused to admit this evidence, thereby preventing its consideration by the jury. We deem that this record book, if true and correct, was of extreme importance in determining liability in the case; for if the great number of boats passed under the bridge and if the bridge was raised and lowered each time and at the hours as exhibited upon this record book, then it is amazing to us that plaintiff and his witnesses did not see or hear the boats, or the raising or lowering of the bridge. This evidence was of vital importance as affecting the credibility of the statements made by the plaintiff and his witnesses.

It is patent to us that the evidence was clearly admissible in view of the diametrically opposed statements of plaintiff's and defendant's witnesses, provided that the record book is proven to have been accurately kept by the employees of the defendant. See Wigmore on Evidence (2d Ed.) § 754. These records are not self-serving declarations. They represent an actual tabulation of fact made at a time unsuspicious. Their reception in evidence will not deprive the plaintiff of the right of cross-examination in questioning their authenticity, accuracy, or correctness. Article 2248 of the Civil Code is without application.

The lower court, having excluded these records from consideration by the jury, committed prejudicial error. It therefore follows that a new trial should be granted.

Because of the necessity of remanding the case, we shall not pass upon the other questions presented.

For the reasons assigned, the judgment appealed from is reversed, and it is now ordered that this cause be remanded to the civil district court for the parish of Orleans for further proceedings according to law and consistent with the views herein expressed.

Reversed and remanded.

PER CURIAM.

Both appellant and appellee have applied for rehearings in this matter. Our attention is called to the fact that in our original opinion we neglected to tax costs of appeal.

It is therefore ordered, adjudged and decreed that the original decree in this case be amended by ordering the plaintiff-appellee to pay the costs of appeal.

Both applications for rehearing are refused.

Original decree amended; rehearings refused.