**GAYLORD CONTAINER CORPORA-TION and Liberty Mutual Insurance Company, Appellants,**

v.

**Charley MILEY, Appellee.**

**No. 15740.**

United States Court of Appeals Fifth Circuit.

Feb. 23, 1956.

Rehearing Denied March 27, 1956.

Cameron, Circuit Judge, dissented.

A. J. Waechter, Jr., John V. Baus, New Orleans, La., Jones, Walker, Waechter, Dreux & Poitevent, New Orleans, La., of counsel, for appellants.

Louis B. Porterie, New Orleans, La., Dewell D. Pittman, Bogalusa, La., Duke, Porterie & Davison, New Orleans, La., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and RIVES and CAMERON, Circuit Judges.

RIVES, Circuit Judge.

Appellee sued the appellants to recover damages for the death of his twenty-four year old son. The district court, trying the case without a jury, rendered judgment in favor of the plaintiff in the amount of $6,000.00.

In compliance with Rule 52(a), Federal Rules of Criminal Procedure, 28 U.S.C.A., the district court made a full finding of facts and stated separately its conclusions of law. The facts so found were as follows:

Gaylord Container Corporation owns and operates a paper manufacturing plant in the City of Bogalusa, Louisiana, which occupies a large area of numerous city blocks of land. Under the terms of certain city ordinances, it obligated itself to construct a walkway along the course of what had formerly been Fourth Street, which should remain open permanently for the use of pedestrians.

The walkway, running from east to west, commences at a point very near the main entrance to the plant. Along most of its way, it is bordered on either side by a chain link wire fence, six or seven feet high, with barbed wire strung across the top. At Avenue "Q" there is an opening in the fence where an electric trolley crosses the walkway from the paper mill on the northern side to the

box factory on the southern side. That opening is kept closed by gates, except when open for the passage of an electric car. At the gate on the northern side is a watchman's station. Continuing westward from the intersection of Avenue "Q" and veering southwestward, the path crosses eight or ten railroad tracks. Along part of the path in this area, the fence is only on the north side and not on the south side. After crossing the last railroad track at a point a few feet from a railroad roundhouse, the path veers 90 degrees to the right, or north, and there is a sidewalk going north for 160 feet. Then the path ends at what is now still Fourth Street, which continues westward from this end of the path.

"Along the path from Avenue 'Q' to the roundhouse there are two watchmen's stations or shacks. One located at the intersection of the path and Avenue 'Q'. Another is located sixty feet to the eastward of the right angle turn of the path next to the roundhouse. Between this last watchman's shack and the roundhouse there is no fence along either the northern or southern course of the path and the path at this point crosses four sets of railroad tracks. To the north of this path, about in the middle of this open space of the fence between the roundhouse and last watchman's shack, there is sunken into the ground a trough or flume which runs north and south. The southern end of the flume commences thirty-five feet from the pathway. This flume or trough is eight feet in depth; and two feet wide in the narrow part of it and is recessed into the ground so that the top, which flares out to a width of six feet, is flush with the ground. It has slanted or curved walls at the top which are faced with steel plate. The flume is five hundred feet long and is covered by an overhead steel girder supported crane over its northern reaches. The southern one hundred and for-

ty feet of the flume does not have this overhead crane.

"The purpose of this flume is that logs, from railroad cars along the railroad tracks which run parallel and close to the flume, are dropped into the flume. When in operation the flume has a stream of water normally six feet deep which is pumped from its southern end towards its northern end for the purpose of floating logs which are dumped into it to the machinery of defendant's paper mill. The logs, upon reaching the north end of the flume, are grappled by a hook conveyer and conveyed several feet to a large rotating drum whose purpose and operation is the churning of the logs against each other and the sides of the drum so as to remove the bark from them. The logs, after having been tumbled, go on another mechanical grappler another short distance to a series of large whirling knives whose purpose is to reduce the pulp wood logs to chips of about one cubic inch, more or less. The chips are further processed through defendant's mill into various paper products. The above described instrumentalities and machinery are operated by defendant simultaneously and as a continuous automatic process. * * *

"The flume is constructed in such a manner that if in operation a man falling into it would be entrapped and could not escape therefrom without help from someone else on the outside on the bank of the flume.

"This mechanism in its entirety, the flume, conveyers, bark tumbler and chipper machines were in operation on the night of May 23, 1952, until very shortly before seven o'clock A. M. when the human flesh and bones were found on the chipper screen.

"About forty feet east of where the path makes a ninety degree turn to go north next to the roundhouse there is a shell path which leaves the

main path at a ninety degree angle. This shell path goes north for forty or fifty feet to a point in the immediate vicinity of the sunken flume. This path stops there. * * *

"That around midnight on May 23, 1952, the decedent, Lloyd Isaac Miley, was in an intoxicated condition to the extent that anyone seeing him, even at a distance, would appreciate his infirm state of mind and body. Furthermore, he had the general reputation in the community of Bogalusa for drinking on frequent occasions and on at least one previous occasion Gaylord's own employees, acting in the course of their employment, had him removed by police from their plant when he tried to enter it in a drunken condition. In this obviously infirm condition, Miley entered the timekeeper's building from the street and attempted to go through this timekeeper's office and through the workmen's entrance to the plant whereupon he was stopped by one of defendant's guards. He was directed out of the plant and out of the timekeeper's office back to the sidewalk on Fourth Street, and was then permitted by defendant's employees to proceed in a staggering and drunken condition westward along the path which follows the former course of Fourth Street. This path led almost inescapably to a perilous area that was known, or should have been known, by these employees to contain dangerous instrumentalities such as railroad tracks, cars, engines and various machinery, including a sunken and camouflaged flume in an area containing inadequate lighting, fencing or gates, barriers, safeguards and safety devices to protect the public at large and this obviously infirm and helpless individual.

"The guard at the guardhouse station where the electric trolley crosses the pathway in question did not see the decedent go past his sta-tion but admitted leaving his guardpost during the course of his duty, going to the canteen for his personal satisfaction as a regular course of his employment.

"The guard at the guardhouse station located at the pathway and the Avenue 'Q' open gate to the plant also did not see the decedent go past his station.

"The fact is inescapable that decedent, Miley, passed within a very few feet of these guardhouses because he was seen at a point west of them by two of defendant's employee trainmen who not only appreciated his intoxicated and infirm condition, though he was seen at a distance, but they recognized him as 'a Miley' and the one who had worked at the Jitney Jungle Store which is where it was established the decedent, Lloyd Isaac Miley, was employed at the time of his death. These trainmen were on a track proceeding from south of the pathway to the paper mill on the north of the pathway. They first saw the decedent by the headlights on their engine as they were approaching the path from the south. They again saw him at a point in very close proximity to the track along which their train had just crossed as he was staggering along an east to west course on the pathway. They even discussed his obviously drunken and infirm condition but did nothing to protect him from the perils of the area in which they found him.

"The guard in the next guardhouse (the sawmill guardhouse) stated that, though he was in the guardhouse on duty and it was his duty to see that no unauthorized person entered the plant at that point, he did not see the decedent, Miley, enter the plant there. He further stated that he would not have permitted such a person in that condition, or even sober, to have entered that area at that point. This guardhouse is located on the north side of

the path right next to an opening of fifty feet in the fence. Through this opening pass four sets of railroad tracks which run north right next to the flume's banks. The south end of the flume is only thirty-five feet from the path through this opening.

"The decedent, Miley, did enter the mill enclosure and fell into the flume and went through the flume, the first chain belt, the bark tumbler, up the second conveyer belt, and automatically went through and was consumed by the chipping machine, which is designed to reduce the pulp wood logs to wood chips about an inch square. * * *

"Decedent, Lloyd Isaac Miley, was twenty-four years old. At the time of his death he was employed as a Clerk at the Jitney Jungle Store making $30.00 a week. He lived in a home with his father, Charley Miley, Complainant, a World War I pensioner in the amount of $75.00 a month. The father, the decedent and a sister of the decedent lived together; the decedent contributed towards their mutual support by furnishing groceries on a regular basis and had spent several weeks a short time before his death painting his father's home. * * * " 1

The district court's conclusions of law are quoted in the margin.2

1. There is omitted from the foregoing summary of facts, the following parts, which the appellant claims to be erroneous:

"All of the above described machinery was inadequately guarded and the flume or ditch was in close proximity of a walk or pathway. There were no adequate fences or warning signs or other determents between the pathway and the flume or ditch which is only thirty-five feet from the path and constructed in such a manner as to constitute a hidden or camouflaged trap, flush with the ground, unmarked or designated, poorly lighted at night. * * *

"There is lighting on the overhead girder system for the crane along the northern portion of the flume, but the southern one hundred and forty feet, which is nearest the path, does not have this overhead crane and lighting; and there are some lights along the roof of the roundhouse directed on the path which runs north and south at that point. There are no lights over or directed at the flume at its nearest point to the pathway. And there are no lights for a distance of one hundred and seventy-five feet northward of the path at its nearest point to the southern end of flume until the overhead crane commences."

2. "The Court hereby enters the following conclusions of law:

"1. The pathway across the Gaylord Container Corporation plant from the intersection of Avenue 'S' and Fourth Street westward across the Gaylord property to the path west termination (sic) at a point at Fourth Street and the Gaylord roundhouse is a perpetual servitude or easement running with the land in favor of the public giving to the public the right of free passage along it. Godchaux v. Iberia Vermilion R. Co., 132 La. 77, 60 So. 1027; Kohn v. Bellott, 169 La. 352, 125 So. 269; Lawson v. Shreveport Waterworks Co., 111 La. 73, 35 So. 390; City of Shreveport v. Simon, 132 La. 69, 60 So. 795; Broussard v. Etie, 11 La. 394; Fish [Fisk] v. Haber, 7 La.Ann. 652; Cleris v. Tieman, 15 La.Ann. 316; Morgan v. Lombard, 26 La.Ann. 462; Torris [Torres] v. Falgoust, 37 La.Ann. [497] 500; Anderson v. Thomas, 166 La. 512, 117 So. 573; Kelly v. Pippitone [12 La.App. 635], 126 So. 79; Martini v. Cowart [La.App.], 18 So.2d 849 [Id., La.App.], 23 So.2d 655; West La. [SA–] Civil Code, Article 743 and notes of decision thereunder II dedication.

"2. The owner of a publicly dedicated pathway across its premises owes to the public and a particular individual of the public the duty of ordinary care, the same as that owed to an invitee upon its land. Lawson v. Shreveport Waterworks Co., 111 La. 73, 35 So. 390; Lanier v. Hammond Lbr. Co., 141 La. 829, 75 So. 738; Baucum v. Pine Woods Lumber Co., 130 La. 39, 57 So. 577.

"The owner of property adjacent to a public path or roadway owes a duty to the public to refrain from creating in a reasonably close proximity dangerous conditions or entrapments. Lepnick v. Gaddis, 72 Miss. 200, 16 So. 213 [26 L.R.A. 686]; Favorably cited by La. Court of Appeal. Builliard v. N. O. Terminal Co. [La.App.], 166 So. 640; [65] C.J.S., Negligence, § 57.

"Under Louisiana law the duty of

The appellants concede that Gaylord owed to Lloyd Miley the duty of maintaining the pathway in a reasonably safe condition, but they insist that, when he departed from the path available for his use, he became a trespasser to whom Gaylord owed only the duty of refraining from willfully or wantonly causing him injury.[3]

Appellants further insist that the doc-

care owed to a person who is obviously intoxicated is higher than that owed to an ordinary person in like circumstances and is the same duty as that owed to a child. Gouzien v. Feraci, 2 La. App. 115; Grennon v. New Orleans Public Service [10 La.App. 641], 120 So. 801; Blackburn v. Louisiana Railway & Navigation Co., 144 La. 520, 80 So. 708.

"3. The substantive law of Louisiana is that the doctrine of discovered peril will be followed and a defendant is charged with seeing what he could have seen in such cases and then a burden to act accordingly to prevent injury to others is placed upon him. Jackson v. Cook, 189 La. 860, 181 So. 195; Rottman v. Beverly, 183 La. 947, 165 So. 153; Dupuy v. Veazey [La.App.], 63 So.2d 756; Wheadon v. Porter [La.App.], 69 So. 2d 610; [65] C.J.S., Negligence, § 57.

"4. The Louisiana law is such that the decedent's, Lloyd Isaac Miley's, drunken condition does not amount to contributory negligence which will prevent recovery under the circumstances that his condition as (sic) observed, or should be observed by the defendant, and the defendant has it within its power and ability to avoid harm to him or avoid injury to him; Rottman v. Beverly, 183 La. 947, 165 So. 153; Wheadon v. Porter [La.App.], 69 So.2d 610; Eggleston v. Louisiana & A. Ry. Co., La. App., 192 So. 774; Cassar v. Mansfield Lbr. Co., Inc., 215 La. 533, 41 So.2d 209; and this doctrine would be applied by Louisiana Courts against a defendant operating a potentially dangerous instrumentality. Tillman v. Public Belt Railroad Commission [La.App.], 42 So.2d 888; favorably cited by the Fifth Circuit Court of Appeals in Texas & Pacific Ry. Co. v. Black, 203 F.2d 574, 576.

"These cases throw upon the defendant a duty of explaining why the person who was injured was not seen and the injury was not avoided. Such a burden has not been borne by the defendants in this case.

"5. Defendant's employees were guilty of negligence in permitting the decedent, who was in an obviously drunken condition, to proceed down a path which led almost inescapably to dangerous equipment and instrumentalities.

"Defendant's employees saw or should have seen the decedent in an obviously helpless condition in an area containing dangerous instrumentalities and failed to take any precautions to avoid his being injured by those instrumentalities.

"Defendant created a camouflaged entrapment in close proximity to a heavily travelled public pathway and failed to safeguard it properly.

"Defendant created a misleading path which led from the main pathway in the near proximity of where the main pathway took an actual course 90 degrees from its original course just as did the misleading pathway and this misleading pathway led directly to within a few feet of a camouflaged or hidden, unlighted and unguarded, dangerous entrapping sunken flume.

"Defendant's guards failed in their specific duties to observe and prevent people from entering their mill which contained numerous dangers, situations, entrapments and hazardous machinery.

"Defendant's employees permitted the decedent, Lloyd Isaac Miley, to proceed in an obvious drunken and helpless condition into an area containing death dealing traps, instrumentalities and devices, which constitutes wanton and wilful negligence.

"Defendant's employees are charged with seeing what they could have seen and are further charged with failing to prevent injury to a helpless person when the means to do so was within their power had they only been observant to see what they could and should have seen.

"The decedent, Lloyd Isaac Miley, was twenty-four years old at the time of his death. Complainant, his father, was fifty-five years old at the time of his son's death; and in view of decedent's close personal relationship with his father by virtue of having lived in the same home all of their life and the natural affinity between father and son, and by virtue of his having contributed in part to the support of the household by furnishing groceries for the common upkeep, as well as helping with the maintenance of the house, an award of $6,000.00 is in order to compensate, insofar as money can do so, his father, the plaintiff, for the loss of his son's life.

"(Sgd) Herbert W. Christenberry
"U. S. District Judge."

3. Citing Mills v. Heidingsfield, La.App.,

trine of last clear chance is not applicable to this case, because:

"(A) As a condition precedent to the application of the doctrine, the plaintiff must prove that the defendant was negligent and in this case there is no proof of negligence on Gaylord's part;

"(B) The doctrine of last clear chance only applies to a situation where a defendant is in control of a moving, dangerous instrumentality or force and where the failure of the defendant to arrest the movement of that force inevitably results in injury to the plaintiff."

■ The general rule is well established that,

"A possessor of land abutting upon a public highway is subject to liability for bodily harm caused to young children by an excavation or other artificial condition maintained by him thereon so close to the highway that it involves an unreasonable risk to such children because of their tendency to deviate from the highway." 2 Restatement, Torts, § 369.[4]

Partly in recognition of that duty, it seems to us, Gaylord maintained the high wire fence and the watchman service along the pathway.

That the open flume constituted an unreasonable risk to children could hardly be disputed. As the district court found: "The flume is constructed in such a manner that if in operation a man falling into it would be entrapped and could not escape therefrom without help from someone else on the outside on the bank of the flume."

In Gouzien v. Feraci, 2 La.App. 115, 117, it was said:

"But being drunk did not put him beyond the protection of the law.

On the contrary, it placed him in the position of a child—or of those unable to take care of themselves and called for more caution on the part of others. Horsthemke v. New Orleans Ry. & Light Co., 146 La. [931,] 932, 84 So. 210."

See, also, Blackburn v. Louisiana Ry. & Nav. Co., 144 La. 520, 80 So. 708, 712; Grennon v. New Orleans Public Service, 10 La.App. 641, 120 So. 801, 803.

In Tillman v. Public Belt R. R. Commission, 42 So.2d 888, 891, the Court of Appeal of Louisiana, Orleans Division, reviewed the doctrine of discovered peril as expounded in cases from the Louisiana Supreme Court and stated: "And we see no reason to believe that the Supreme Court would not hold that the doctrine of apparent peril should also be applied against a railroad or against any defendant operating a potentially dangerous instrumentality."

■ This open flume containing a flowing stream of water six feet deep, pumped under pressure, and logs churning against each other, moving toward a series of whirling knives, is most certainly a potentially dangerous instrumentality.

We agree with the district court that Gaylord's servants failed to perform their duty to Lloyd Miley after they discovered him in a drunken and helpless condition, headed along the path toward the place where they could reasonably anticipate that he might deviate from the path and fall into this veritable death trap.

The judgment is therefore

Affirmed.

CAMERON, Circuit Judge (dissenting).

---

192 So. 786; Vargas v. Blue Seal Bottling Works, 12 La.App. 652, 126 So. 707; Mercer v. Tremont & G. Ry. Co., La.App., 19 So.2d 270.

4. Keeping in mind the requirement of "an unreasonable risk," we think this statement of the rule is consistent with the Louisiana decisions as exemplified in

Fredericks v. Illinois Central R. Co., 46 La.Ann. 1180, 15 So. 413, and O'Conner v. Illinois Central R. Co., 44 La.Ann. 339, 10 So. 678, and is not contrary to the cases of Peters v. Pearce, 146 La. 902, 84 So. 198, and Buchanan v. Chicago R. I. & P. Ry. Co., 9 La.App. 424, 119 So. 703.

Basic in the findings of the Court below, now embraced by the majority, is the idea that a landowner is under duty to guard his premises against the intrusion of trespassers. If one should enter despite the owner's vigilance, his safety is virtually insured by the owner,—especially if he is drunk. In my opinion, the authorities cited do not cast private property upon so precarious a base. Nor do they place such a premium upon inebriety. Finding no support for the result either in law or in morals, I am impelled to dissent.

Rehearing denied: CAMERON, C. J., dissenting.