**SHAW et al. v. MISSOURI PAC. R. CO.
et al.**

No. 294.

District Court, W. D. Louisiana, Monroe
Division.

July 2, 1941.

C. Elliot Thompson and James H. Dormon, both of Monroe, La., for plaintiffs.

Hudson, Potts, Bernstein & Snellings, of Monroe, La., for defendants.

PORTERIE, District Judge.

The complaint here is by the legal tutrix for the benefit of the minor child of the deceased. For the minor, as provided by Article 2315 of the Civil Code of Louisiana, there are claimed (a) all the rights of action for damages in the deceased himself which have survived in favor of the minor, and (b) the damages sustained by the minor because of the death of the father.

This case was previously considered by us on a motion filed by the defendant for involuntary dismissal (Shaw v. Missouri-Pacific R. Co., 36 F.Supp. 651), and what is said there is made a part of this opinion. There is need of reading what is said on the motion in order to make this opinion, which is on the merits of the case, more definitely clear.

The complaint clearly outlines a case based on the doctrine set out in the case of Miller v. Baldwin, La.App., 178 So. 717, generally accepted by the legal profession to be defined at page 722, and fully quoted by us in our previous opinion on the motion for involuntary dismissal (36 F.Supp. at page 652). In Cheek v. Thompson, D. C., 28 F.Supp. 391, will be found a more detailed study of the doctrine. We shall now proceed, matching the facts to the requirements of the definition.

■ The defendant has shown, by the clear preponderance of the evidence, that John Pittman was not in passive negligence at the time of the accident, as he was not drunk, or to any real degree in-

toxicated. The evidence of plaintiff was that eight persons had drunk, over a period of two or three hours, eight quarts of beer and a pint of gin; and that at 9:20 p. m., Pittman left a colored tenant residence he was visiting to go to bed at his own tenant house three doors removed. Though there were three friends present, no one thought of escorting or aiding him to his house. There is nothing in the record of plaintiff as to Pittman's actions or movements from that time, 9:20 p. m., to the time of the accident, 10:25 p. m. The distance from this colored residence, which Pittman left supposedly to go home, to the place of accident is only 1,300 feet. On the other hand, the defendant, by a number of disinterested and truthful witnesses, has proved that Pittman went to a colored barber shop after having left this colored residence, had a haircut, and left the barber shop between 9 and 10 o'clock—and to all appearances was absolutely sober. On the following day, when news of his death became known to the three barbers who testified, no thought came to them of Pittman being intoxicated the previous night just before the accident.

From the colored tenant's residence to the barber shop is 3,200 feet; then from the barber shop to the place of accident is 2,750 feet; the time necessary to cover the sum of these two distances (5,950 feet) makes better account of the period of one hour (9:20 p. m. to 10:25 p. m.) than does the time necessary to cover the relatively short distance of 1,300 feet.

Then, the engineer operating the defendant's train testified that when he first saw Pittman on the track Pittman was in a seated or stooping position on the right-hand rail, and that he moved his head, showing that he was not physically inert to become classified under the doctrine of the Miller v. Baldwin case as being in passive negligence. He was not drunk nor was he asleep. There is no evidence to prove, nor is it claimed, that he was entangled.

■ Though this finding on want of passive negligence in Pittman is alone sufficient to disqualify him under the doctrine, we shall nevertheless take the next point of inquiry, as to the character of the place where the accident happened: a part of a populous city, an urban section, a place where people frequently use the tracks as a footpath, or where there are habitations and highway crossings.

Using one of the two aerial photographs filed in this case and taking the point where Pittman was hit by the train as the center of a circle, circumscribed by using a radius as long as the photograph permits, and then dividing the circle into quadrants, we find that the upper right and lower left quadrants have the least habitation—parts of them are the equivalent of open farming country. The upper left quadrant is just a little more settled, not very much; and the lower right quadrant is fully settled with one-story negro tenant frame houses.

There is but one road crossing involved in the physical picture. The evidence is that a short road parallels the railroad track on the west side for only about 250 feet, then runs over the main railroad and the switch tracks—on a perpendicular for about 200 feet—then divides to serve the cluster of houses on the other side.

It is proved that alongside the tracks of the railroad company there are footpaths; however, there is actually no footpath running on the west side of the track at the point where Pittman was seated on the rail facing away from the center of the track. The proof as to the use by trespassers of the railroad tracks is that whatever movement there is by pedestrians along the track is in the main at two periods of the day; in the morning and in the afternoon, at the time that school children go to and from school. The plaintiff has filed pictures of the locality in the record which show trespassers, mainly children, moving alongside the tracks. The photographs offered by the defendant have but few people, if any, moving alongside the tracks. The main evidence, and certainly the most dependable evidence on this point, was offered by the defendant, which had a check made for seven successive nights, hour by hour, on the trespassers moving to and fro. The proof is that the number of trespassers between the hours of 9 and 10 p. m. on the seven nights was 2, 4, 0, 2, 0, 0, and 2; and between the hours of 10 and 11 p. m. on the seven nights was 0, 0, 1, 1, 1, 1, and 3. We reach a total of only seventeen pedestrians in a period of fourteen hours.

A number of witnesses for the railroad company, notably the engineer (and he has been making this run for over twenty years), testified that in the nighttime from 9 to 11 p. m. there is practically no use of the tracks by pedestrians.

The city of Monroe has no ordinance fixing the speed of trains at this point.

Therefore, all in all, the court finds that this particular section is practically a rural section; that the habitations thereabout are not thick and, because of their kind, shelter but few people; that the use of the tracks by trespassing pedestrians is very slight; and that, conclusively, this is not an area where the operators of the train in question were bound to regulate and reduce the speed of the train below that at which it was running just before and at the time of the accident.

The evidence is clear and wholly preponderant that there was no neglect by the defendant company at any time—before the accident, at the time of accident, or after the accident. The evidence by plaintiff on the speed of the train is scant, too general, and approximative; mainly is by a retired Pullman porter living in the neighborhood. The acceptable evidence is that the passenger train, making the run from St. Louis to New Orleans, was not behind time, was not running beyond 55 miles per hour when several miles outside of the corporate limits of the city of Monroe; that the engineer tested his brakes (which he had done satisfactorily for the fourteen stops made in the run from Little Rock to Monroe), thus reducing his speed to between 40 and 45 miles per hour just before crossing the Illinois Central tracks—the latter being 435 feet from the place of the accident.

█ Though we have determined from the facts that Pittman was neglectful, at the very time of the accident, by remaining where he was after the train used every type of alarm possible (the automatic bell-ringer was on before crossing the I. C. tracks, successive whistle notices had been given for the I. C. crossing, for the road crossing, and for the station, the latter being but about 2,500 feet further than the road crossing; and quick, short blasts had been continuously given from the moment Pittman was seen to the moment of impact); after the train retarded its speed by service application of the brakes and then followed by full and effective application of emergency brakes after discovery of danger; and though we have also found that the railroad was free of negligence; there is still the point of law to determine whether or not facts preponderantly show that the railroad company made all efforts possible, in a timely way and free of

any neglect, after discovery of Pittman's position on the track, to avoid the accident. In other words, is the defendant liable under the last clear chance doctrine.

The evidence is that as the train approached the road crossing, an automobile with bright headlights entered the side road paralleling the track on the west side, coming toward the train. This chance circumstance caused the engineer to be partially blinded during the short period of time required for the automobile to cover the length of the road (192 feet, length that the road parallels the railroad track). It was only when the headlights of this automobile veered to the right—the automobile then going over the track, the engine of the train then being but about 75 feet from the middle of the crossing roadway, the train running at a speed of from 30 to 35 miles per hour—that it became possible for the engineer (not the fireman) to see Pittman, seated on the righthand rail of the track at a spot 267 feet from the engineer.

At the moment that Pittman was seen by the engineer, the service brakes being already on, the full emergency brakes were immediately set and the train stopped within 600 to 650 feet. Undisputed expert witnesses have proved this to be a very good, and short, stop. There was no defect in train equipment and safety appliances. It is clear, and there is really no evidence at all to make even a surmise to the contrary, that all was done by the operators of defendant's train to avoid the accident.

█ The plaintiff relies upon the alleged excessive speed of the train as the proximate cause of the accident. We rehearse the evidence on this point: The speed of the train was not in excess of 55 miles per hour out in the open country, before it entered the suburbs of the city of Monroe. It was then reduced to about 45 miles per hour before crossing the I. C. tracks, because the engineer desired to test the safe effectiveness of his brakes to properly control his train to make the intended stop at the station less than a mile ahead—this reduction was through what is called a service application. The evidence is that the speed of the train was again reduced by the further application of the brakes as soon as the engineer saw the auto lights, and this was after the engine had passed the tower at the I. C. crossing; and the evidence is that when the auto crossed the track just ahead of

the engine and Pittman became visible—the train then going about 30 to 35 miles per hour—the full emergency brakes were applied. We find this to be no excessive or neglectful speed under the circumstances.

By the preponderance of evidence, applying the doctrine of last clear chance in this case, the defendant was never aware of the plaintiff's peril, or unaware of it through carelessness on its part, so that it had a later opportunity than the continuously neglectful plaintiff to avert the accident.

Plaintiff has failed in his case; judgment rejecting the demand made and dismissing this case will be signed.