Plaintiff sued as the dependent father of his son, Doris Adolphus Neal, commonly known as Pete Neal, alleged to have been negligently killed when struck and run over by a freight train of the defendant railway company. There was judgment rejecting plaintiff's demands, from which judgment he brings this appeal.
At about 6:45 o'clock P.M., on December 21, 1942, a regularly scheduled northbound freight train of the Louisiana Arkansas Railway Company, passed through the village of Goldonna in Natchitoches Parish. A few minutes before passage of the train Pete Neal, a young man *Page 375 
about 29 years of age, had been observed walking along the railroad track, over which the train subsequently passed, proceeding in a northerly direction. The inference is that the young man was returning to his home, which was located approximately a half to three-quarters of a mile up the track from the depot, and some 350 feet or more away from the right-of-way. That night, after the arrival of the freight train in Minden, which was the end of the run for the train crew, as the locomotive of the train was in process of being serviced at the roundhouse, it was discovered that a human leg was caught in the underpart of the locomotive near the front drivewheel. Search for the body was immediately instituted by employees of the defendant railway company, and badly mangled portions of the body were recovered at points along the line a short distance north of the village of Goldonna. According to the testimony of the witnesses who engaged in the search for the body, the first evidence of the accident was found at a point about 175 steps north of the depot. This evidence consisted of a part of a foot and shoe, later identified as belonging to the decedent.
The testimony, taken in connection with maps of the track and surroundings in the vicinity of the accident, discloses the physical facts of the scene of the accident. The track of the defendant railway company approaches the village of Goldonna from the south and crosses a trestle about 1500 feet south of a main highway crossing, which is about 650 feet south of the depot. Just north of the depot, a distance of approximately 125 feet, there is a dirt road crossing, which is used primarily for the accommodation of trucks engaged in loading cars upon a passing track paralleling the main line, which extends from a point a short distance south of the depot some 2,190 feet north. About 1,135 feet north of this crossing there is a third crossing which is used for the same purpose. The crossings are identified on the maps and in the testimony of witnesses, in the order in which they have been set forth above, as A, B and C, respectively. Crossings B and C lead from the State highway No. 9, which at these points parallels the railway tracks, across the railroad right-of-way. In other words, these are blind crossings which do not connect with any roads on the west side of the railroad and which are used almost exclusively for the accommodation of pulpwood and other freight loading-trucks. There is a foot-trail from crossing B to the west, leading to a blacksmith's shop, some 200 feet off the track.
While it is alleged that the village of Goldonna is incorporated, this fact is not proven, nor are the limits of the alleged corporation fixed. It is established that, according to the 1940 census, the population of Goldonna was about 250 souls. The business establishments and residences comprising the village are all located on the east side of the railway tracks, with the exception of two or three residences which are situated on the opposite side of the tracks at points nearly opposite the depot.
The railway track approaches Goldonna in a curve from south to west, straightening out for a short distance at a point 225 feet north of crossing B. After passing crossing B the land adjacent to the tract for a short distance consists of cultivated fields, giving way to wooded sections, and there are no habitations near the railroad track from a point some 300 feet north of the depot to the Neal place some half mile up the track.
The point at which the unfortunate accident took place, because of the nature of the circumstances and the lack of definite testimony, cannot be accurately fixed, but it must be concluded that Pete Neal was struck at some point between crossings B and C. We have located the approximate point on the track within a range of not less than 500, nor more than 750, feet north of the depot.
The passage of the train at 6:45 o'clock P.M. was at about the hour of deep dusk, and a misting rain served to lower visibility. The headlight of the locomotive was burning at the time.
It is established to our satisfaction that the whistle of the locomotive was sounded for crossing A and again sounded at or about crossing B, and that the bell was rung continuously, not only between these points, but for a considerable distance beyond crossing C. The train was moving at a speed of 28 to 30 miles per hour, and, according to the testimony of the train crew, which was not successfully controverted, the engineer and fireman were in their places in the cab, maintaining a lookout and attending to their duties; the head brakeman was in the gangway of the locomotive cab observing the train toward the rear, and the conductor was in the caboose *Page 376 
looking north from his position in the cupola.
Other facts which may be regarded as definitely established show that the victim, Pete Neal, was quite drunk at the time he was last seen by any of the witnesses. That morning he had presented himself at Natchitoches for examination and had been rejected for military service. Even at the time of the examination he had been drinking heavily, and there is no doubt that he continued to drink throughout the day. He was observed by a number of the witnesses at various intervals just prior to the passage of the train through Goldonna. One of these witnesses, the depot agent of the defendant railway company, testified that he saw him walking along the track some ten or fifteen minutes before the train passed, and that he was staggering and was obviously in an advanced stage of intoxication.
As to the position and exact location of the victim at the instant of the accident, there is no evidence. We do not know whether he was still staggering along the track, or whether, overcome by the effects of his drinking, he was prostrate between the rails of the track.
It is evident from the testimony of the engineer and fireman that neither of them saw Pete Neal upon the track. The engineer testified that he saw something which looked like a piece of paper about 3 feet long lying on the tracks about 75 feet ahead of him, just north of crossing B. Shortly after passing this point he heard a slight noise beneath the locomotive and when the train was stopped at Skidder for the purpose of setting out some freight cars, he and the fireman made an examination of the brake rigging, the pilot and cow-catcher, but found no evidence that the locomotive had struck any object.
It is established that there are no footpaths or trails along or across the railway tracks in the vicinity of the accident, nor is there any conclusive evidence which would indicate that the tracks were used to any material extent or degree by pedestrians. Indeed, there is no evidence that there was any reasonable or practical necessity for the use of the tracks in proceeding from one given point to another, or even in the nature of shortcuts between any defined points.
In order to establish negligence on the part of defendant, it is incumbent upon plaintiff to prove some acts of commission or omission on the part of defendant's employees, the operators of the train in question. In this plaintiff has completely failed. The vicinity of the accident was not thickly populated, and the very nature, character and location of nearby habitations relieves defendant's employees of any liability on the ground of excessive speed. The rate of speed of 28 or 30 miles per hour at the place and under the conditions surrounding the accident was not in itself negligent.
The only remaining basis for the establishment of negligence would be proof of the fact that defendant's employees, charged with the operation of the locomotive, could, or should, have seen the victim of the accident in time to bring the train to a stop and prevent inflicting injury. Since it has been established that the victim was incapacitated and utterly unable to perceive the danger or to protect himself against it by reason of his intoxicated condition, it follows that if the members of the train crew could have seen him upon the track or so near as to be obviously in a place of danger, it was their duty to exert every effort to avoid the accident. And if the peril of the victim could have been seen in sufficient time to avert the accident, then the failure of defendant's employees to observe the danger and to avert the accident would establish liability upon defendant.
It is disclosed by the record that the headlight of a locomotive at night would enable recognition of the figure of a man at a distance of some 750 to 800 feet, but it is also established that the train in question could have been brought to a stop in a distance of not less than 1,300 feet. Even allowing for probable error in these calculations, and giving every reasonable benefit of all calculations to plaintiff, it remains evident that the accident could not have been averted.
As a matter of fact, we find that the vision of the engineer and fireman was limited and restricted to distances much less than even the 750 or 800 feet illuminated by the focal beam of the locomotive's headlights. The engineer, leaning out of his cab on the curve passing the depot had a maximum vision of less than 200 feet, and at the point where the track became straight, and when his vision along the track would have been normal, the locomotive at that time was within 200 to 500 feet of any point lying within the stretch *Page 377 
of track upon which the accident must have taken place. The vision of the fireman on the opposite side of the cab was limited by freight cars standing on the passing track, and further was limited by the physical facts of a dusky, murky light and weather condition. It is also true that the beam of the headlight in making the curve, and before reaching the straight track, was sweeping in an arc outside of the far rail of the track from the position of the fireman, and at the time that the track straightened and the beam became fixed, he, too, was prevented from seeing any object upon the track at or near the location of the accident in time to have warned his engineer.
Thorough study and consideration of the record in this case convinces us that there is nothing to indicate that the employees of defendant saw any object on the track which was recognizable as a human being. Nor is there any evidence which would lead to the conclusion that defendant's employees could and should have seen Pete Neal in time to avert the accident.
This case falls within that class of cases in which the victim was guilty of negligence, but, because of his intoxicated condition, was unable to protect himself from danger. However, since the accident occurred in the neighborhood of a sparsely settled community, where the train crew could not be reasonably expected to anticipate the presence of a person upon the track, the members of the crew are not answerable to the charge of negligence on the ground that they failed to keep the locomotive under such control as to permit a stop within range of the headlights. The facts in the case of Pinckley v. Texas P.R. Co., La.App., 165 So. 504, were much more favorable to the contentions of plaintiff than are the facts which have been developed in the instant case, and in that case, this court denied recovery.
We have carefully studied the cases cited by counsel for appellant, and, in our opinion, each of them is clearly distinguishable from the case at bar. The case of Smith v. Texas P.R. Co., La.App., 189 So. 316, and of Browne v. Texas P. Ry. Co., La.App., 193 So. 511, belonged to that class of cases dealing with crossing accidents. In these cases the question of the sounding of a warning whistle or bell was an important feature. In the instant case, we have found as a fact that both whistle and bell were sounded, but, even conceding that the warning signals were not used to the fullest extent, we do not believe that such a conclusion would be sufficient to justify a finding in plaintiff's favor. Unquestionably, the victim was in an advanced stage of intoxication, and, in such a condition, warning signals, in all reason, would have proved of little value. Be this as it may, at best such a discussion is speculative and has no serious bearing upon either facts or law involved in this case.
The holding in Ross v. Sibley, L.B. S.R. Co., 116 La. 789, 41 So. 93, is clearly inapplicable, since the finding in that case was to the effect that the engineer perceived the danger in time to avoid the accident. The Ross case involved a logging train that was traveling at a very slow rate of speed, which could have been brought to a stop within a very short distance after the engineer saw the peril in which the victim had placed himself.
In the case of Sorey v. Yazoo M.V.R. Co., 17 La.App. 538, 136 So. 155, 158, it is true that the court classifies accidents in which the exercise of ordinary care, as distinguished from extraordinary care, is required. The application of the doctrine of extraordinary care would result only from a finding that the train at the time of the accident was passing through a populous center, within which vicinity the tracks were used as a matter of custom or habit by numbers of people. These facts have not been established in the case before us, and, on the contrary, we have found that the vicinity of the accident was not thickly populated, nor were the tracks customarily or habitually used by any appreciable number of individuals.
The facts and circumstances which were under discussion in the case of Shipp v. St. Louis Southwestern R. Co., La.App., 188 So. 526, 528, were entirely different from those presented in the instant case.
We find nothing in the facts of the case before us which would indicate the applicability of the doctrine of the last clear chance.
For the reasons set forth, the judgment appealed from is affirmed. *Page 378