George Tillman, a fifty-nine year old Negro laborer, was run over by a locomotive of the Public Belt Railroad Commission for the City of New Orleans at about eight o'clock, on the night of December 30, 1947, a short distance below the Barracks Street crossing in New Orleans. The locomotive was being operated with its tender end forward and was pulling a string of fourteen freight cars, some empty and some loaded. Tillman's left leg was so badly injured that, at the Charity Hospital in New Orleans, it was found necessary that it be amputated just below the knee. He brought this suit against the City of New Orleans, through the said Public Belt Railroad Commission, alleging that the accident had resulted from negligence of the employees who were operating the locomotive, and praying for judgment in the sum of $16,500.00, with interest and costs.
The Board of Administrators of Charity Hospital of Louisiana at New Orleans intervened and alleged that Tillman had received treatment, surgical services, medicines, etc., at that institution for which a charge of $361.50 would be proper, and prayed that in the event of judgment in favor of Tillman and against the said City of New Orleans, through the Public Belt Railroad Commission, it, the said Charity Hospital, have judgment in solido against the said defendant and Tillman in the sum of $361.50, with attorney's fees.
The Public Belt Railroad Commission answered, denying all negligence on the part of its employees and averring that Tillman, at the time of the accident, was a trespasser and that he, "by his own wilful actions, placed himself in a position of peril." Defendant averred too that its employees "could not reasonably be expected to anticipate the presence of plaintiff on its tracks," and that "because of conditions prevailing at the time of the accident and at the place of the accident, defendant did not and could not discover the presence of plaintiff until it was too late * * *." In the event that it should appear that there was negligence in any of the employees of the defendant, it specially and in the alternative pleaded contributory negligence.
In the Civil District Court for the Parish of Orleans there was judgment dismissing *Page 890 
plaintiff's suit and the intervention of the Charity Hospital, and Tillman has appealed.
We do not find in the record any evidence of an appeal by the Charity Hospital. Therefore, even if there is liability in defendant, there can be no recovery by the intervenor. See Blanke v. Miranne, La. App., 11 So.2d 264.
There is very little disagreement over most of the facts, the only controverted question being whether or not the employees of the Public Belt Railroad Commission should have seen the plaintiff sooner than they did and whether they could have brought the locomotive to a stop in order to avoid him, if they had seen him as soon as plaintiff charges they should have discovered him.
It is shown that Tillman had become completely intoxicated and had, as he expressed it, "passed out" before the locomotive approached, and was lying prone on the cross-ties between the two rails of the track. There is some little dispute as to how far below the Barracks Street crossing he was lying, but we think that the record shows that he was about 150 feet below that crossing and probably 80 feet or so above the extension of Esplanade Avenue. The record shows that there was considerable traffic of various kinds across that and the other tracks at Barracks Street and alongside the track, both on the parallel roadway and on the wharf which was between the roadway and the Mississippi River.
There was a ferry landing nearby and a large proportion of the passengers and vehicles which used that ferry made use of the Barracks Street crossing, but it is rather conclusively shown that that ferry did not operate after nightfall.
A short time before the unfortunate occurrence, Tillman had been seen by John Godwin, who was a switchman for another railroad — the Louisville Nashville — and whose place of duty was somewhere between 100 and 180 feet from the spot at which Tillman was lying when he was struck. When Godwin first saw him, he was obviously very drunk and had fallen to his knees one one of the tracks of the Louisville Nashville Railroad. Godwin says that he was "pretty close to him" and ordered him to move on. Tillman then staggered across the other tracks and disappeared into the general direction of the point at which he was later struck, but Godwin did not see him again until just as the Public Belt locomotive was approaching, when he says that he saw "some object bump up right ahead of the train * * *." This object proved to be Tillman. At that time, according to Godwin, Tillman was "something like 100 feet away * * *" from him.
As we have said, the locomotive was pulling a string of fourteen cars and was operated with the tender end forward. There was on that end a headlight which apparently was just like the one on the other end. This headlight was about ten or twelve feet above the ground and it projected a beam of light which struck the ground from 140 to 160 feet ahead of the locomotive.
There was a slight curve to the left and because of this curve, the headlight did not project its beam directly between the rails.
The locomotive was being operated at a speed estimated at from six to eight miles an hour, and the "object" was discovered when it was about 20 feet, more or less, from the locomotive which was brought to a stop when most of the tender had passed over Tillman. We think it unnecessary to discuss in detail the evidence on this point, but conclude that after Tillman was discovered everything possible was done to avoid him and that the train was brought to a very good stop.
The question then is, was there negligence in the employees in not sooner discovering plaintiff lying between the rails ahead of the locomotive?
Counsel for plaintiff not only concedes that plaintiff was intoxicated, but in truth, relying on that fact, contends that since he had completely lost the ability to save himself, there could have been no contributory negligence on his part and that, therefore, there came into play the doctrine of the last clear chance and the extensions thereof which have been called the doctrine *Page 891 
of discovered peril and the doctrine of apparent peril.
The doctrine of discovered peril made its appearance in Louisiana in the case of Rottman v. Beverly, 183 La. 947,165 So. 153, 156, in which our Supreme Court said: "* * * if a plaintiff negligently puts himself in a place of danger and his negligence and danger are actually discovered by the defendant, then there devolves upon the defendant a duty which intervenes or arises subsequent to the negligent acts of the plaintiff, and that duty is to save the plaintiff from the consequences of his negligent acts if he can. * * *"
Shortly thereafter, in Jackson v. Cook, 189 La. 860,181 So. 195, 197, the court explained or extended the doctrine of discovered peril, saying that there may be liability not only for failing to avoid striking some one after discovering him, but even for failing to discover such person if he should have been discovered by the exercise of proper care. The court said: "* * * that the duty of those in charge of motor cars and engines to look ahead and observe never ceases; that what they can see they must see and in legal contemplation they do see; that their failure to see what they could have seen by the exercise of due diligence does not absolve them from liability."
Both of those cases have been cited many times since. Each of them involves an accident in which a motor vehicle was the offender. But the first of those doctrines — that of "discovered peril" — has been held to be equally applicable where a train or other railroad equipment is involved. See Hicks v. Texas N. O. R. Co., 186 La. 1008, 173 So. 745; Russo v. Texas P. Ry. Co., 189 La. 1042, 181 So. 485. And we see no reason to believe that the Supreme Court would not hold that the doctrine of apparent peril should also be applied against a railroad or against any defendant operating a potentially dangerous instrumentality. Therefore, as a result of these decisions and of many others, we conclude that there is now firmly established the rule that the operator of a motor vehicle, or of a train, or other instrumentality, which may cause injury, is under the duty of discovering the peril of a pedestrian or other person on or near the roadway or railway ahead and of avoiding that person if it is possible to do so by the exercise of reasonable care, even though the peril may have resulted from the negligence of the person himself.
But this does not mean that in any event and under all circumstances there is liability to the pedestrian or other person who may be struck.
This is made evident by the fact that there are numerous cases in each of which some fact was found which excused the failure to discover the peril sooner. For instance, in Cheek v. Thompson, 28 F. Supp. 391, 393, Judge Porterie of the United States District Court for the Western District of Louisiana, found that there was a curve in the track ahead of the locomotive and that because of this curve and for other reasons the engineer did not discover the "object" on the track sooner. The court said: "(n) The accident occurred at a point of curvature of track, preventing the engineer, who was on the convex side, from actually being able to see the point of accident for several hundred yards before injury."
That finding was approved by the United States Circuit Court of Appeals for the Fifth Circuit. See Cheek v. Thompson,140 F.2d 186.
In Griffin v. Thompson, 11 So.2d 114, 117, the Court of Appeal for the First Circuit found that there was a curve in the track ahead of the locomotive and said that "* * * it was physically impossible for any of its operators to see the two unfortunate victims of the accident before they were emerging from the curve, * * *."
In Homeland Ins. Co. v. Thompson, 12 So.2d 62, the Court of Appeal for the First Circuit held that where, because of a fog, it was impossible for the operators of the train to see objects at a greater distance than from 40 to 150 feet, the doctrine of discovered peril did not render the railroad company liable. See also Heydorn v. New Orleans Public Service Company, La. App., 35 So.2d 893. *Page 892 
We also find the question of the effect of the doctrine of discovered peril exhaustively discussed in Eggleston v. Louisiana A. R. Co., La. App., 192 So. 774. There the Court of Appeal for the Second Circuit found that the automobile which was struck was not discovered until two seconds prior to the crash. It was contended that under the doctrine of the last clear chance the failure of the employees to discover the automobile and to avert the accident rendered the defendant liable. There was a curve in the track immediately ahead of the locomotive as it approached the crossing. The court discussed the various cases cited involving the doctrine of discovered peril and held that there was no liability in the defendant.
These and other cases indicate clearly that the doctrine of discovered peril and the doctrine of apparent peril do not create absolute liability in such cases, but merely throw upon the defendants the duty of explaining why the person who was injured was not seen and was not avoided.
Why then was Tillman not seen by the crew sooner than he was seen, and why was the accident not avoided?
Defendant maintains that he was not seen for either or both of two reasons:
First, that there was a curve in the track, as a result of which the headlight did not project its beam between the rails where Tillman was lying, and
Second, that there was a very heavy fog which prevented the employees from seeing Tillman until the locomotive was so close to him that it could not be stopped.
The existence of the curve is a physical fact which cannot be controverted. It is very obvious that a headlight which projects its beam 140 feet ahead will project the beam outside the rails rather than between them as it enters such a curve and there is nothing to contradict the evidence showing that the curve had this effect.
There is, however, evidence to which counsel for plaintiff points as contradicting the testimony of other witnesses to the effect that there was a very heavy fog. For instance, Godwin, the employee of the Louisville Nashville Railroad, says that when he saw the "object" rise in front of the locomotive, he was some distance away from it, and counsel says that if he saw the object the employees of the locomotive should have seen it sooner than they did. Counsel also points to the fact that two police officers were called to the scene, and the one who appeared as a witness said that they had no difficulty in reaching it, though he could not recall whether or not there was a fog.
However, practically all of the other witnesses testified that there was a heavy fog.
Smith, an employee of defendant, was on what may be called the running-board on the tender end of the locomotive. He says that "it was foggy; you could hardly see." He added that it was "a foggy night, very foggy." Referring to the ferry, he said that on a night like that "I doubt whether the ferry would run."
Morel, who was operating the locomotive, says: "That night was very foggy and misty, an especially heavy fog."
Robbins, who was also on the front running-board of the locomotive, says that there was a "dark and heavy fog — very low," and he followed this by saying "that was one of the worst fogs I have saw since I am employed * * * at that point."
Chase, who was on the other, or rear end of the train says that they were very carefully protecting the train "on account of it being so foggy."
Rachal, who was fireman on the locomotive, said that though he had seen heavier fogs than that, "you couldn't see the car next to the engine."
We attach little significance to the fact that the police officers reached the scene without difficulty. It is well known that the fogs which are prevalent at certain times in this locality are much denser near the river than elsewhere, and it is quite possible that the police officers who came from more central portions of the City were not interfered with by fog.
We cannot fail, however, to attach some significance to the fact that Godwin saw the "object" when he was more than 100 feet away from it. Still we do not think *Page 893 
that his testimony and the fact that he saw that object should be permitted to overcome the effect of the positive testimony of so many other witnesses who say that there was a very heavy fog. It is well known that fog may be dense at one spot and yet easily penetrated a short distance away. Godwin was looking at the object from another direction; he was across the tracks while the locomotive was approaching on the same track and from a direction which was parallel to the river. The clothing of Tillman was dark and it was, no doubt, difficult for the employees on the locomotive to discover him sooner than they did.
At any rate, from all of the testimony we conclude that because of the curve and because of the fog the employees of defendant were not negligent in failing to discover Tillman. We feel that to hold that that they should have discovered him under the circumstances which we have set forth would be tantamount to holding that under any and all circumstances any person so located must be discovered and avoided. The jurisprudence of this State does not go so far.
The judgment appealed from is affirmed.
Affirmed.