LANDRY, Judge.
This matter presents the appeal of defendant Consolidated Companies, Inc. (hereinafter referred to simply as “Consolidated”), and its liability insurer, The Travelers Insurance Company, from a civil jury verdict in favor of plaintiff, Luther Spiers, a railway conductor formerly employed by the Kansas City Southern and Louisiana & Arkansas Railway Company (hereinafter referred to simply as L & A), and judgment of the lower court predicated thereon in the sum of $50,000 for personal injuries allegedly sustained by plaintiff at or about 8:40 A.M., October 16, 1956, on which occasion plaintiff was violently thrown from his seat in the caboose of a long freight train operated by his employer when the train made an emergency stop within the city limits of the City of Baton Rouge, Louisiana, to avoid striking a truck belonging to Consolidated and left standing upon the main line track of L & A.
Plaintiff’s version of the incidents leading to the accident was set forth in an original petition filed October 15, 1957, and a supplemental and amended petition filed March 10, 1959. In the former it is alleged the accident occurred October 19, 1956, while in the latter the date of the accident is said to be October 16, 1956. The petitions relate that Consolidated, through a subsidiary known as Cash Grocery and Sales Company, maintained and operated a large warehouse situated on the east side of and adjacent to the L & A right of way in the block bounded by Main Street on the north and Laurel Street on the south.. Plaintiff alleges (and the evidence shows) the L & A tracks run north and south immediately to the east of defendant’s warehouse and make a rather long “S” curve to' the south thereof. It is further alleged that the L & A has constructed a spur or side track along the western edge of its-right of way parallel and adjacent to defendant’s warehouse for the specific purpose of serving defendant’s business with direct access to railway facilities. The pleadings allege that to the east of this spur-track is situated the main line track of the L & A Railway which the evidence shows is located approximately 12 feet east of the-aforementioned spur. Plaintiff next sets-forth that on the morning of the accident,, .a freight car was standing near the south end of defendant’s warehouse (a few feet north of Laurel Street) and a truck belonging to defendant was backed up to the door on the east side of the box car to either load or unload same and was positioned in such manner that it was at a right angle to the box car with its front wheels extending beyond both rails of the main line of the railroad blocking or, in railroad parlance, “fouling” the main line. It is averred in the petitions that L & A train No. 42 (a freight train consisting of 3 diesel engines drawing a string of approximately 120 freight cars and the caboose in which plaintiff was riding), traveling northerly along the main line en route from New Orleans, Louisiana, to Alexandria, Louisiana, at a speed of approximately 8 miles per hour, approached the impediment thus created but, because of the curve in the track and the presence of a house and tree adjacent to the east side of the right of way, the enginer could not observe the obstruction in time to make a normal stop. Plaintiff alleges that in order to avoid striking the truck, the engineer “bigholed”' *798 the train (a railroad idiom meaning an ■emergency stop) resulting in plaintiff being violently ejected from his seat in the caboose and thrown to the floor as a result of which plaintiff sustained a right inguinal hernia.
The petition continues by relating that subsequent to the accident, plaintiff was hospitalized for a hemioplasty and while in tlie sanitarium recuperating therefrom he ■experienced vomiting and chest pains but was permitted to return home within four ■or five days following the surgery. Plaintiff then alleges that on November 9, 1956, he suffered a nearly fatal myocardial infarction or coronary thrombosis (in lay language a heart attack) which has rendered him totally and permanently disabled to perform his occupation as railway conductor and thereby necessitating his resignation from his former employment in such ■capacity. It is specifically alleged in plaintiff’s petition that the action of defendant’s employee in fouling the main line -was in express violation of the terms of •an agreement entered into by and between defendant and L & A on August 31, 1933, in which defendant is given the right to ■•use the railroad right of way between Laur.el and Main Streets, and more particularly paragraph 13 thereof.[1] Finally plaintiff alleges his present disability (ad-mittedly resulting solely from his present heart condition) is either the direct result of the injury sustained in the accident of •October 16, 1956, or the accident caused the hernia necessitating the hernioplasty of October 27, 1956, and the myocardial infarction which followed the operation was a post operative complication either causing the infarction or aggravating a previous asymptomatic condition to the extent of producing disability which did not exist theretofore.
Defendants filed exceptions of no right and no cause of action which do not appear to have been passed upon in the lower court. These exceptions have not been argued before us either orally or in brief and are, therefore, presumed to be abandoned.
In answer to plaintiff’s original and supplemental petitions, defendant in effect denied the occurrence of the accident and alleged that with the knowledge and consent of the L & A defendant, its employees and customers have, since the year 1933, used that portion of the railroad right of way lying between Laurel and Main Streets, and particularly the part thereof adjacent to its warehouse, as a private driveway pursuant to the provisions of the agreement referred to in plaintiff’s petition. In substance, defendant further alleged it had no knowledge of the accident of October 16, 1956, until approximately 11 months thereafter when defendant .received a letter from plaintiff’s attorney dated September 18, 1957, wherein amicable, demand was made on behalf of plaintiff. Defendant contends its defense is made more onerous because of the conflicting dates upon which the accident is alleged to have occurred and no report of. such an incident was ever made to defendant by any of defendant’s employees. The answer next points out that in addition to’ the case at bar, plaintiff filed suit in the *799 Federal Court,[2] wherein plaintiff sought recovery from his employer of the sum of $200,000 for injuries received while in the course of his employment and resulting from two accidents, one said to have oc-eurred in mid September, 1956, and the other on October 19, 1956, both of said accidents allegedly resulting from the negligent acts of railroad employees.[3] Defendant further relates that it was drawn into *800 the Federal Court suit by third party petition filed by L & A subsequent to which development plaintiff compromised the suit against L & A for the sum of $20,000, reserving his rights against present defendant but reducing his demand against defendant to the sum of $50,000. In substance, defendant alleged that if its truck did in fact foul the main line as plaintiff contends, such action was not negligence in view of its agreement with L & A and its constant use of the right of way subsequent thereto. Defendant further alleged that the right of way between Laurel and Main Streets has, to the knowledge of the railway company, been used for a number of years as a public thoroughfare, and, on numerous occasions, both freight and passenger trains have been required to stop to permit removal of vehicles left unattended on the main line.
In the alternative, defendant’s answer sets forth that if the action of its employees did constitute negligence such negligence was the remote and not the proximate cause of the accident inasmuch as the engineer in charge of the train had the last clear chance to avoid the accident. In this connection, defendant charges the engineer was guilty of operating the train at a speed in excess of the maximum legal rate of 8 miles per hour within the city limits and failure to maintain a proper lookout and observe the truck in time to bring the train to a normal stop. The answer also denies that the accident of October 16, 1956,'was the cause of plaintiff’s hernia and asserts the cause thereof to be the former accident which occurred near Alexandria, Louisiana, during the previous month. In the final alternative, defendant maintains there is no causal relationship between the hernioplasty performed October 27, 1956, and the myocardial infarction sustained by plaintiff November 9, 1956.
Although defendant vigorously denies the occurrence of the alleged accident on either October 16, 1956, or October 19, 1956, because a check of its records fails to disclose that it had a box car on its siding on either date, we believe the record as a whole establishes the occurrence of the accident as alleged by plaintiff. For reasons which will hereinafter be made manifest, it matters not whether, the accident occurred October 16, 1956, or October 19, 1956, therefore, we shall confine our discussion of this issue to consideration of the evidence establishing the occurrence of the accident on October 16, 1956.
Regarding the occurrence of the accident, Homer Lee Thornton testified he was the engineer in charge of train Number 42 consisting of approximately 120 freight cars being drawn by three diesel engines. He stated the train left New Orleans, Louisiana, on the morning of October 16, 1956, en route to Alexandria, Louisiana, and arrived in Baton Rouge between the hours of Eight and Nine O’clock A.M. According to Thornton, at the time of the accident he was stationed at his proper post on the right or east side of the northbound engine which was traveling at an estimated speed of 8 miles per hour, the maximum legal rate within the city limits. As he approached defendant’s warehouse situated to his left on the west *801 side of the track and when he was only about 200 feet south thereof, he then for the first time observed a small light colored panel truck backed up to a box car standing on defendant’s spur, a short distance north of the north line of Laurel Street, which truck was parked in such manner that it faced in an easterly direction with its front wheels extending over both rails of the main line completely fouling the track. Thornton immediately activated the maximum braking capacity of the train and brought the train to a stop approximately 20 feet south of the offending truck. According to Thornton, he descended from the engine and noted a Negro driver in the cab of the truck attempting to move the truck but experiencing difficulty in so doing because the front wheels of the vehicle were in a shallow ditch along the east side of the railway right of way. After maneuvering the truck back and forth several times, the driver eventually succeeded in removing it from the track. Thornton remained at the scene approximately 10 minutes to reestablish the proper air pressure in the train’s braking mechanism (it having been completely exhausted in making the emergency stop), and then continued on his way. He was certain the accident occurred on October 16, 1956, and although at one time he thought it might have occurred on the 19th, he recalled it was on the 19th that he made his report on the incident to the company and it was this fact which caused him to confuse the dates. His testimony shows that after the train had stopped plaintiff contacted him via radio and inquired as to the reason for the emergency stop and Thornton advised him that he had placed the train in emergency stop to avoid hitting a truck fouling the main line.
Joseph Norwood, an engine foreman for L & A, testified he was on train 42 at the time of the accident having boarded same in the City of Baton Rouge at a point sev eral blocks south of the scene of the ao cident. Norwood was riding in the third engine and after the^ sudden stop, he alighted from the train, walked to the front of the train and observed the truck parked across the main line approximately 20 feet ahead of the engine. He noted a Negro driver seated in the truck rocking the truck back and forth in an effort to drive it away. He testified he did not speak to the truck driver but noted that the truck was a light colored panel truck with the words “Capitol Supply Company” [4] painted on the side thereof facing the train. Norwood was positive the incident occurred October 16, 1956 and not on the 19th.[5]
George Johnson, a brakeman riding in the caboose with plaintiff, testified that an emergency stop was made and he believed it to have occurred on October 16, 1956. He stated that on the occasion of the sudden stop plaintiff was violently thrown from his seat in the caboose and plaintiff thereupon immediately informed him that plaintiff had been hurt. Johnson did not see the truck but overheard the radio conversation between plaintiff and Thornton in which Thornton informed plaintiff the stop was made to avoid running into a truck.
We conclude the evidence preponderates in favor of the occurrence of the accident as alleged by plaintiff.
Defendant’s contention that the negligence of its employee in fouling the main line of the railroad (if such act was in fact negligence) is not actionable because, under the circumstances peculiar to the case at bar, such negligence was not the proximate cause of the accident, appears to be well taken. In this regard, defendant’s position is predicated on the *802 theory that Thornton, the engineer, had the last clear chance to avert the accident and failed to do so, therefore, under the well established jurisprudence of this state, Thornton’s negligence is considered the proximate cause of the accident and defendant’s negligence the remote cause thereof, the negligence of Thornton relieving defendant of liability herein.
In the precedent setting case of Rottman v. Beverly, 183 La. 947, 165 So. 153, the Supreme Court of this state adopted the rule that when a person negligently places himself in a position of peril which is discovered by another in time to avoid injury to the former but fails to avail himself of the opportunity to do so, the negligence of the party failing to exercise the last clear chance to avert the injury is held to be the proximate cause of the injury and the negligence of the injured party the remote cause thereof. The rule established in the Rottman case was extended in Jackson v. Cook, 189 La. 860, 181 So. 195, 197, wherein the doctrine of last clear chance was held applicable to those cases in which the defendant did not actually discover the perilous plight of the injured party in time to avoid the injury but, by the exercise of reasonable care, should have done so.
In Jackson v. Cook, supra, we find the following:
“Up to the time the Court of Appeal decided the Rottman case, 162 So. 73, the jurisprudence relating to the last clear chance doctrine was confusing. This court in several cases had said in general terms that, where the negligence of a plaintiff continued up to the moment of the accident, there could be no recovery. Such statements had been made without qualification, and what we held in the Rottman case was 'that such statements were too broad, and we qualified the rule by holding that, when a defendant sees another in peril of which the other is not aware, then a second or subsequent duty arises and devolves upon the defendant, which duty is to use every possible available means to avert injury. We said (165 So. at page 156):
“ ‘If the defendant fails to perform that duty, his negligence in that respect is regarded as the proximate and immediate cause of the injury and the negligence of the plaintiff in putting himself in a place of danger, the remote cause. In such cases the last clear chance doctrine applies even though plaintiff’s negligence continues up to the accident.’
“The only difference between the Rottman case and the case presently before us is this: In the Rottman case Mrs. Rottman was guilty of gross negligence which continued up to the moment ,of the accident. Beverly, the driver of the automobile, actually saw her in her perilous position in time to avert the accident had he used proper precautions. In the present case the plaintiff was guilty of gross negligence which continued up to the moment of the accident. The driver of the car did not see, but could have seen, plaintiff in his peril if he had been looking ahead. The mere fact that the driver of the car in this case did not see plaintiff does not absolve the defendant from liability, because it was the duty of the driver to look, and, according to the findings of both courts, he was not looking. The Rottman case is not authority for holding that, merely because the driver of the car in this case did not actually see the plaintiff, the defendant is not liable.”
Innumerable subsequent decisions have reaffirmed the above principles, including the more recent cases of Cassar v. Mansfield Lumber Co., Inc., 215 La. 533, 41 So.2d 209 and Litton v. Samuel, La.App., 98 So.2d 534.
In the recent Federal Court Case of Texas & Pacific Ry. Co. v. Black, 5 Cir., 1953, 203 F.2d 574, 576, in holding the rail *803 way company liable for damage to a tractor-trailer parked in such manner as to foul defendant’s track in the City of New Orleans, the Federal Court held the law of Louisiana to be as follows:
“The district judge held that under the law of Louisana, if the operator of a train sees, or in the exercise of reasonable care should see, a person in a position of peril from' which the person can not extricate himself, at such time that by the exercise of reasonable care the train could be brought to a stop before striking the person, the operator of the train has the last clear chance to avoid the accident, and if he fails to exercise due care so to do he is guilty of negligence, and the injured person may recover even though he be a trespasser and his own negligence continues to the moment of the injury. Rottman v. Beverly, 183 La. 947, 165 So. 153; Jackson v. Cook, 189 La. 860, 181 So. 195; Tillman v. Public Belt R. R. Comm., La.App., 42 So.2d 888. This principle is not limited to personal injuries, but extends as well to property damage. See also Shaw v. Missouri Pac. Ry. Co., D.C., 39 F.Supp. 652; Cheek v. Thompson, D.C., 28 F.Supp. 391; Neal v. Louisiana & Arkansas Ry., La.App., 17 So.2d 374; Griffin v. Thompson, La.App., 11 So.2d 114.”
In the course of its ruling in the Black case, supra, the Federal Court in holding the negligence of the railway employee to be the proximate cause of an accident quite similar to the one involved in the case at bar, the Federal Court remarked:
“The district judge found that although plaintiff was negligent in parking the International truck so that it fouled the railroad track, the engineer of the train saw, or could have seen, the tractor, and that it was fouling the track, at least 300 feet before the train reached the point of impact; that the engineer’s failure to immediately apply the emergency brakes, and keep them applied, was negligence on his part; and that such failure was the proximate cause of the accident. The engineer testified that he could have stopped the train within 200 feet or less, if the emergency brakes had been immediately applied and not released.” (Emphasis supplied.)
The record of this case contains undisputed evidence to the effect that since execution of the agreement of August 31, 1933, wherein L & A granted defendant express permission to use its right of way between Laurel and Florida Street as a private thoroughfare, trucks belonging to defendant, as well as those of other shippers (including trucks belonging to L & A) have constantly used that portion of the' L & A right of way between defendant’s spur and the main line for parking in the' process of loading and unloading freight cars spotted on defendant’s siding. It further appears that in the process of loading and unloading cars, defendant, its shippers and customers normally followed the procedure of backing trucks up to the east side of the box car at right angles thereto fouling the main line. The testimony shown that at no time has the L & A ever complained to defendant about the practice which thus developed and existed over a period of many years. We believe it fair to state Thornton testified he had never before been compelled to stop for a truck but that he was fully aware trucks were frequently parked in the right of way adjacent to defendant’s warehouse.
Learned counsel for plaintiff contends the doctrine of last clear chance is inapplicable to the case at bar because the evidence shows Thornton, the engineer, could not see the truck in time to avoid the accident because of the “S” curve in the track and the presence of the house and tree on the east side of the right of way.
Thornton testified that he did not see the truck until his engine reached a point approximately 200 feet south thereof; that. *804 it was impossible for him to have seen it sooner because of the curve and the aforesaid house and tree and that if he could have seen the truck while he was 450 feet distant therefrom, he could have made a normal stop without danger to either the train or its crew.
Plaintiff also called as a witness one Jimmie F. Mims, an engineer, who testified concerning visibility, stopping distance and the technical aspects of “bigholing” a train. Mims, an employee of L & A for 17 years and graduate of a course in railroad engineering, testified Thornton could not see the truck until approximately 200 feet distant therefrom and that an emergency stop of a train of the length and load of No. 42, traveling at a speed of 8 miles per hour, could be made within a distance of 175 feet. In this respect his testimony appears eminently correct considering Thornton testified he first saw the truck while 200 feet away yet stopped the train 20 feet south thereof. Mims also stated that a train composed as No. 42 was composed on the date of the accident could make a normal uneventful stop in 300 feet.
In addition Mims gave a most enlightening explanation of the technical and mechanical aspects of the procedure involved in stopping a train from which discourse we understand that each component unit of the train possesses separate and independent braking facilities which operate on the wheels of each individual car or unit. The brakes are energized by air pressure furnished by means of lines or hoses with which each car is equipped, the hose of each car being joined to the line or hose of the unit fore and aft at the time the train is assembled so that the line in effect flows from the lead engine to the rearmost unit of the train. After the lines are thus connected and before the train embarks upon its journey the entire continuous line is then pumped up or pressurized to the required pressure. The engine contains certain controls designed to operate the braking system under different circumstances. One control is designed to reduce the speed of the train in transit or bring it to a gradual, slow stop. In utilizing this particular control only a portion or fraction of the air pressure in the system is used and its replenishment may be effected while the train is in motion. Another control is designed especially for emergency use and its application involves immediate utilization of the entire pressure in the system. Once the train is placed in emergency or “bigholed” it must come to a stop and cannot resume its progress until the line is again pumped or pressurized. When the “bigholing” process is initiated the braking process takes effect on the engine wheels in about 7 seconds following application and is thereafter transmitted through the connected air hoses car by car to each successive unit of the train. When the emergency brakes become operative the engine “set down” or stops whereupon the slack in the coupling mechanism of the car immediately behind the engine is taken up and the second car stops by literally ramming into the preceding engine. As each unit of the train is thus brought to a halt in an emergency stop, the force of the impact against the preceding unit increases in progression toward the rear of the train consequently the impact of the last car against the car immediately ahead is greatest of all.
In contending that the doctrine of last clear chance is not applicable because it was impossible for the engineer to see the truck until he was so close he could not have avoided striking the truck except by making an emergency stop, learned counsel for plaintiff relies upon the testimony of Thornton and Mims and certain aerial photographs introduced in evidence. In this connection there is also of record a map of the area made by Rhea D. Percy, Civil Engineer, reproducing the exact degree of the curve in question and showing the south curb line of Florida Street (the next street south of Laurel Street) to be 482 feet south of the point where defendant’s truck was parked, said distance being measured along the L & A track. Despite *805 the testimony of Thornton and Mims to the contrary, certain pictures introduced in evidence by plaintiff, namely D-3, D-4 and D-7, clearly show that the truck could have been seen by a person standing on the track at least 540 feet south of the truck. More particularly D-3 taken from a point approximately 540 feet south of the spot where the truck was parked, clearly reveals the presence of a light colored station wagon parked on the track at the approximate point where the truck was situated on the date of the accident. In this regard, counsel for plaintiff vigorously argues the view of the engineer in the cab of the engine is vastly different from that of a person standing on the track and that, from the engine, the engineer did not have unimpeded vision because of the curve and the obstructing house and tree previously mentioned. Defendant introduced in evidence photograph D-7 taken from the cab of an engine and which shows that the view of the engineer from that vantage point was even better than that of an individual standing on the track. Although the evidence does not show the exact distance from which photograph D-7 was taken, from landmarks clearly visible and identifiable, it appears to have been taken from a point in the vicinity of Florida Street approximately 450 feet south of defendant’s warehouse. We are convinced the photographs show the truck could have been seen at a distance of 450 feet or greater. On this issue counsel for plaintiff contends the aerial photographs showing the general area and more particularly the curve in the track indicate the engineer could not have possibly seen the truck sooner than he did. We have hereinabove analyzed in detail the visibility of the engineer from the engine cab and found that he could have seen the truck in time had he been keeping a proper lookout. The view of the accident scene from the air is of little probative value. Unfortunately for plaintiff, the cause of his injury was a train and not an aircraft.
We are inclined to attach more weight to the testimony of Mims than that of Thornton regarding the distance in which a normal stop could have been made under the circumstances for the testimony of the former clearly shows he is far better versed in the technical aspects of railroading than the latter. Assuming, arguendo, Thornton was correct in stating the normal stopping distance to be 450 feet as opposed to 300 feet testified to by Mims, we are convinced from the evidence that Thornton could have seen the truck while at least 450 feet distant had he been maintaining a vigilant lookout.
We do not hold that the agreement of August 31, 1933, conferred upon defendant the right to foul the track at will, nor is it necessary for us to so hold for purposes of this decision. We do say, however, that in conformity with the recognized weight of authority such written authority expressly granting defendant use of the right of way, clearly removed defendant from the category of a trespasser and characterized defendant’s use of the area as that of licensee or invitee. In such circumstances, the railway granting such use, and its employees are held to a greater degree of care and vigilance than is owed to a mere trespasser. The following pronouncements on the subject matter appearing in Volume 75 C.J.S. Verbo Railroads § 904, p. 287 and § 905, p. 289, are believed pertinent:
“The amount of care required of a railroad is commensurate with ' the reasonably apprehended danger or probability that persons might be on the track or on the premises at a particular point. Where within the knowledge of the company persons, including licensees or trespassers, have been accustomed to be on the tracks at a certain place, as where the public has habitually passed across or along the tracks or the right of way at a certain place for a long time with the company’s knowledge or consent, such *806 as in a city or thickly settled community where persons are likely to be found trespassing, it is the duty of the railroad to use reasonable or ordinary care and diligence to discover and avoid injury to such persons, since it has reason to anticipate the presence of persons on the tracks at such point, and it has no right to presume that the track is clear. It has been held that this doctrine is confined to cities or thickly populated communities, and that it does not apply in rural or sparsely settled communities although people in the neighborhood frequently pass across or along the right of way; nor does it apply with respect to a person on a track in the railroad’s private yards. Liability may be imposed even though the particular employees in charge of the engine or cars which caused the injury to the person on the track were ignorant of such custom or were unaware of his presence on the track. Where the company is operating a train on a city street used in common by it and pedestrians and vehicles, it must take precautions against collisions which are not necessary when it is operating trains on its own-right of way, but where the street is away from the traveling public the railroad is not held -to the same strict accountability as in the case of the streets of a thickly populated community. * * *
“As a general rule, except where the presence of a licensee on or near the tracks is known or may reasonably be expected, the railroad company owes no affirmative duty of care or active vigilance to him. The railroad company must use reasonable or ordinary care to avoid injuring a person who is on the right of way by its express or implied consent or invitation.
“The rights of mere or bare licensees are entirely different from the rights of persons who.are upon premises of a railroad company by invitation, express or implied, for a purpose connected with its business. As a general rule, except where the presence of a licensee on or near the tracks is known or may reasonably be expected, the railroad owes no affirmative duty of care or active vigilance to him, and the extent of its duty is not wantonly or willfully to injure him, or to exercise ordinary care when it becomes cognizant of his peril.
“Where a person is on the right of way by the express or implied consent or invitation of the railroad company, it must use reasonable or ordinary care to avoid injuring him. It owes a greater duty to persons of such class than to mere trespassers or bare licensees. The mere act of permitting the customary use which changes the user’s status to that of licensee does not of itself constitute negligence on the part of the company.”
Applying the foregoing principles to the facts of the case at bar, the engineer was under an even greater duty and obligation of caution than is incumbent upon him under ordinary circumstances. Not only did defendant have the contractual right to use the right of way, but also it had in fact done so for a period, of approximately 26 years to the knowledge of the railway company and its employees, including the engineer, Thornton. Under the circumstances of this case, Thornton had every reason to anticipate the presence of vehicles on the right of way adjacent to defendant’s premises. Assuming the house and tree constituted an impediment of vision as Thornton testified, such circumstances should have prompted him to utilize a higher degree of caution. He was traveling through a congested commercial district of a large city under circumstances which cried out for caution in the highest degree. His failure to exercise such vigilance and care was the proximate cause of the accident.
We are reminded by counsel for plaintiff of that line of jurisprudence hold *807 ing that the finding of the jury on a question of fact is to be given great weight by the appellate courts and should not be disturbed unless manifestly erroneous. We are thoroughly and completely in accord with the principle enunciated and, although we are hesitant to reverse a jury or trial court on a finding of fact, it is our duty to do so when the conclusion of the trier of fact (whether judge or jury) is clearly contrary to the law and the evidence. Decision on this question must turn, in each individual case, upon the facts and circumstances involved. Citation of authority in support of the foregoing principle is deemed unnecessary since it is elementary that circumstances vary in each case presented. The principle must be applied after consideration of all of the evidence adduced in the particular case under consideration.
The learned trial court properly charged the jury that to find defendant liable herein it must find defendant guilty of negligence constituting a proximate cause of the accident. The verdict in favor of plaintiff necessarily implies the jury did, in fact, find defendant guilty of such negligence and in so doing, the jury committed manifest error.
The views herein expressed obviate the necessity of our passing upon the remaining contentions advanced by defendant.
Accordingly, judgment is rendered herein reversing the judgment of the lower court in favor of plaintiff and dismissing plaintiff’s demand. All costs in the lower court and of this appeal to be paid by plaintiff appellee, Luther Spiers.
Reversed.

. “Carrier agrees to permit Shipper and assigns to use the space between Carrier’s main line and the proposed spur track as a private driveway between the hours of .6 A.M. and 6 P.M., it being expressly understood that this shall not constitute a dedication of this property to public use but is for the sole benefit of Shipper and assigns. Any vehicle using driveway shall at all times have a driver in charge so as to immediately move said ■vehicle on the approach of trains or as otherwise necessary. ' Shipper assumes responsibility ior and agrees to save and hold harmless Carrier from any loss or damage to Shipper’s employees or property resulting from the use of this private driveway howsoever occurring.. Carrier shall have the right to install gates for the purpose of closing this driveway and Shipper obligates itself to keep said gates closed at all times when said driveway is not being actually used by it.”

. Luther Spiers Y. La. & Ark. Ry Co. No. 1933 on Docket of District Court of United States Eastern District of Louisiana Baton Kouge Division

. Paragraphs 5, 6, 7, 8, 9, 10 and 11 of the Federal Court suit read as follows:
“5.
“On a date not definitely known to plaintiff, but believed by him to have been approximately in the middle or shortly after the middle of the month of September, 1956, while acting in the course of his employment by defendant in Bapides Parish, near Alexandria, Louisiana, plaintiff suffered injury.
“6.
“Plaintiff was injured when, while carrying a lantern and waybills he was endeavoring to board a caboose on a freight train, in the performance of his duties, and he fell injuring his right foot and leg and his right side; plaintiff did not then believe he had been seriously injured, and after resting continued his duties for defendant.
“7.
“The said fall above described was due to negligence on the part of defendant in failing to furnish plaintiff a safe place to work, and in requiring that he board or catch a moving caboose in the night time while encumbered with a lantern and waybills, and was due to negligence of defendant’s engineer in having failed properly to judge or estimate the length of the train and in running the train too fast at that point despite the fact that he knew that plaintiff in performing his duties was required to board the caboose, and to negligence of defendant in failing to have seen to it that its engineer was properly advised as to the length of the train, and to other negligence of defendant and its officers, agents, and employees not here detailed.
“8.
“On or about October 19, 1956, in East Baton Kouge Parish, Louisiana, in the City of Baton Kouge Louisiana, while in the course of his employment by defendant, and performing duties for defendant, plaintiff was involved in an accident and sustained injury to his body; plaintiff while riding in a caboose of a freight train operated by defendant, in the performance of the duties of his employment, was suddenly thrown forward when the train was brought to a sudden and abrupt stop; although he endeavored to continue his employment he felt gradually worse and on or about October 22, 1956, while in Alexandria, Louisiana, he advised a Yard Master of defendant of the accident that occurred on or about October 19, 1956, said that he believed he had sustained a rupture, and was given a written order to report to a physician employed by defendant, for examination.
“9.
“Plaintiff reported to the doctor, gave the doctor a history of vomiting and of having pain in his chest, and was examined by means of stethoscope and by having his blood pressure taken, was given a prescription, and advised the doctor that he though he was ruptured and was examined for hernia and was told that he did have a hernia and needed immediate operation.
“10.
“Thereafter plaintiff entered Baton Kouge General Hospital at Baton Rouge, Louisiana and was operated on for hernia October 27, 1956, and he developed' vomiting and chest pain, subsequently was sent to his home, and on or about November 9, 1956 was seized with severe chest pain, was again hospitalized, almost died, suffered shock and severe congestive heart failure, and has been advised by his doctors that it is impossible for him to return to his former occupation.
“11.
“Plaintiff alleges that the said accident that occurred on or about October 19, 1956, above described was due to the negligence of defendant in that it permitted the main line on which its freight train was moving to be blocked by a truck or other vehicle of a customer of defendant, despite the fact that this blocking of the main line was at or near the end of a curve which to the knowledge-of defendant and its agents, servants, and* employees, would make it difficult for defendant’s engineer operating a train such as the one on which the plaintiff was riding to see that the truck or other vehiele-was across the main line until near to it; that the said defendant permitted this- *800 truck or other vehicle to be left standing on the main line which was not a street or crossing, which was negligence; that defendant’s engineer on the train was negligent in failing sooner to see the truck or other vehicle, in traveling at the speed he was operating at that point, and in the manner in which he suddenly and abruptly stopped the train in such a way as to cause plaintiff to be thrown forward and sustain injuries; that said defendant was further negligent with respect to the said accident of October 19, 1956 in failing to furnish plaintiff a safe place to work, and in failing to have advised its engineer, prior to the time he saw that the truck or other vehicle was across the main line blocking it, of the presence of the said truck or other vehicle, and said defendant and its agents, officers and employees were otherwise guilty of negligence in connection with said accident, not here detailed.” ■

. Admitted an affiliate or subsidiary of Consolidated.

. He recalled the date because he had been summoned to work that day which would ordinarily been his day off. He did not work on the 19th at all because the 19th was the opening of the squirrel hunting season which day he took off to go hunting.